UNITED STATES of America,
Plaintiff-Appellee,

v.

Matteo ROMANO and Armando Glorioso,
Defendant-Appellants.

Nos. 831, 839, Dockets 82–1323, 82–1325.

United States Court of Appeals,
Second Circuit.

Argued Jan. 31, 1983.

Decided April 15, 1983.

Raymond J. Dearie, U.S. Atty., Mark Summers, Asst. U.S. Atty., Brooklyn, N.Y., for plaintiff-appellee.

Salvatore Quagliata, Ozone Park, N.Y., for Romano.

Guy L. Heinemann, New York City, for Glorioso.

Before FEINBERG, Chief Judge, LUM-BARD, Circuit Judge, and RE, Chief Judge.*

RE, Chief Judge:

Appellants, Matteo Romano and Armando Glorioso, appeal from judgments of conviction entered against them on September 14, 1982, following a jury trial in the United States District Court for the Eastern District of New York. Both appellants were found guilty of conspiracy to possess with intent to distribute heroin in violation of 21 U.S.C. § 846, and were sentenced to ten years imprisonment.

---

* The Hon. Edward D. Re, Chief Judge, United States Court of International Trade, sitting by designation.

Appellants contend that the District Court erred in denying their motion to dismiss their indictment, and raise several questions on this appeal. They allege that the government violated their fifth amendment right to due process, and that there was prosecutorial misconduct in the grand jury proceeding. Appellant Glorioso also contends that certain evidence presented to the grand jury was obtained in violation of international law, Italian Law, and United States-Italian treaty obligations. Since we find all contentions of appellants meritless, we affirm the judgments of conviction.

Nazir Nohra, an informant for the Drug Enforcement Administration who previously had heroin transactions with appellant Glorioso, telephoned Glorioso in Palermo, Italy, concerning a possible sale of heroin. Nohra made the calls from New York and permitted the government to tape them there. During the second telephone call, Glorioso introduced appellant Romano to Nohra as someone interested in purchasing the "merchandise" that Nohra had for sale. After a series of similar telephone calls, which dealt with the details of the proposed transaction pertaining to quality of the "merchandise," price and terms of payment, both Glorioso and Romano travelled to New York. At various times and places in New York they negotiated in person with Nohra and Anthony Wilson, a government undercover agent who posed as Nohra's American partner, for the purchase of kilogram quantities of heroin. After appellant Romano had taken samples of the government-supplied heroin, and left partial payment with Wilson and Nohra, appellants were arrested and charged with conspiracy to possess with intent to distribute heroin.

The first allegation, that the government failed to afford appellants their due process rights, is without merit. In view of the overwhelming evidence of their predisposition to commit the crime charged, appellants do not here contend that they were entrapped by the government. Indeed, appellants do not attack the sufficiency of the evidence against them. Although Romano argued that there was no valid evidence of his predisposition presented to the grand jury, he does not make that claim as to the proceedings before the petit jury. They acknowledge that the defense of entrapment is unavailable "where the predisposition of the defendant[s] to commit the crime was established." *Hampton v. United States,* 425 U.S. 484, 488–489, 96 S.Ct. 1646, 1649, 48 L.Ed.2d 113 (1976). Nevertheless, they maintain that the government's conduct in "inciting" them to come to New York, and in providing the heroin for the proposed sale, was conduct "so repugnant and excessive" as to shock the conscience and deny them due process of law. *United States v. Alexandro,* 675 F.2d 34, 39 (2d Cir.1982).

 The government's conduct in this case falls far short of the "demonstrable level of outrageousness" necessary to bar a conviction. *Hampton, supra,* 425 U.S. at 495 N. 7, 96 S.Ct. at 1653 N. 7 (Powell, J., concurring). The fact that the drug transaction was initiated by the informant Nohra, and that the government supplied the drugs, is not "the kind of outrageous conduct which would violate the defendant's due process rights." *United States v. Nunez-Rios,* 622 F.2d 1093, 1097 (2d Cir.1980); *Hampton, supra.* The appellants were not "incited" to come to the United States. They came voluntarily, in order to complete in person a transaction which had been partially negotiated and arranged by their telephone conversations with Nohra. Furthermore, there is "not a scintilla of evidence" which suggests any coercion. *Alexandro, supra,* at 40.

Surely, nothing in this case evokes the outrage of *United States v. Toscanino,* 500 F.2d 267 (2d Cir.1974) in which the defendant, an Italian citizen, alleged that he had been kidnapped by American agents in Uruguay, brought to Brazil where he was tortured and drugged, and abducted from Brazil into the United States for the purpose of facing criminal charges here. In *Toscanino,* the allegations were so shocking to one's sense of justice that this court held that the defendant was entitled to a hearing on his allegations. Relying principally on the de-

cisions of the Supreme Court in *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886) and *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952), the district court had denied a motion to vacate the verdict and dismiss the indictment. Under the "Ker-Frisbie" rule which developed from those landmark cases, "due process was limited to the guarantee of a constitutionally fair trial, regardless of the method by which jurisdiction was obtained." *Toscanino*, 500 F.2d at 272. This court concluded that the "Ker-Frisbie" rule had been eroded, and had to yield to more recent decisions of the Supreme Court which reflected an expansion of the concept of due process. Hence, based upon more recent pronouncements of the Supreme Court which gave renewed vitality to the concept of due process, and "our supervisory power over the administration of criminal justice in the district courts within our jurisdiction," *Toscanino* held that if the defendant's allegations of government misconduct and kidnapping were true, he was entitled to relief. 500 F.2d at 275–276.

Many cases have dealt with "the doctrine that criminal jurisdiction is not impaired by the illegality of the method by which the court acquires *in personam* jurisdiction ...." Bassiouni, *International Extradition in U.S. Law and Practice*, Chapter V, § 4–1, 283 (1983).

The alleged government misconduct or lawlessness in *Toscanino* was so outrageous that, if the allegations were true, the conduct violated due process and the district court would be required to divest itself of jurisdiction over the defendant. Since none of the flagrant and illegal law enforcement practices which were alleged in *Toscanino* exist here, the appellants cannot benefit from the holding and reasoning of that case.

The reach and applicability of *Toscanino* is clearly illustrated by *United States v. Gengler*, 510 F.2d 62 (2d Cir.1975). In *Gengler*, this court held that the allegation of abduction, even if true, was insufficient to preclude the court below from asserting jurisdiction. In discussing *Toscanino*, the court stated:

Yet in recognizing that *Ker* and *Frisbie* no longer provided a carte blanche to government agents bringing defendants from abroad to the United States by the use of torture, brutality and similar outrageous conduct, we did not intend to suggest that *any* irregularity in the circumstances of a defendant's arrival in the jurisdiction would vitiate the proceedings of the criminal court. 510 F.2d at 65 (emphasis in the original).

No allegation has been made in this case which can in any way compare to the alleged government misconduct of abduction which was deemed to be insufficient in *Gengler*. Appellants' references, therefore, to cases of "police brutality and lawlessness" are inapplicable and unavailing. *United States v. Toscanino*, 500 F.2d at 272. See, e.g., *United States v. Cordero et al.*, 668 F.2d 32, 36–37 (1st Cir.1981); *United States v. Lira*, 515 F.2d 68, 70–71 (2d Cir.1975), *cert. denied*, 423 U.S. 847, 96 S.Ct. 87, 46 L.Ed.2d 69 (1975).

Appellants' reliance on *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978) and *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973) is misplaced. Both cases are clearly distinguishable. In *Twigg*, the defendants were incapable of committing the crime charged, the operation of a "speed factory," without the active intervention and supervision of the government informant. The defendants in *Twigg* were not chemists and lacked the necessary knowledge and ability to build or operate such a factory. Appellants Romano and Glorioso, however, were clearly capable of conspiring to purchase and distribute heroin without the active aid and supervision of the government. In *Archer*, the government attempted to convert a state offense of bribery into a federal crime by discussing the bribe in an interstate telephone call initiated by an informant for the sole purpose of establishing the interstate activity necessary for a violation of the federal "Travel Act." The effort to manufacture jurisdiction in *Archer* is vastly different from an offer to sell heroin which resulted in appellants' volun-

tary travel to the United States to consummate the sale.

Appellants' second allegation of prosecutorial misconduct before the grand jury is likewise without merit, and clearly does not warrant or justify a dismissal of the indictment.

This court has termed a dismissal of the indictment "the most drastic remedy," and is most difficult to justify in cases involving allegations of failure to make known or properly instruct the grand jury on a potential defense. *United States v. Brown,* 602 F.2d 1073 at 1076 (2d Cir.1979), citing *United States v. Fields,* 592 F.2d 638 (2d Cir. 1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979).

■ The basis for appellants' contention is that the prosecutor failed adequately to inform the grand jury on the legal ramifications of the defense of entrapment. In order to justify dismissing an indictment for prosecutorial misconduct, the prosecutor must have knowingly withheld "substantial evidence negating guilt ... where it might reasonably be expected to lead the jury not to indict." *United States v. Ciambrone,* 601 F.2d 616, 623 (2d Cir.1979). A dismissal is warranted only in extreme circumstances, when it is necessary to eliminate prejudice to the defendants, or to ensure that the government attorney acts in accordance with the law. *United States v. Brown,* 602 F.2d at 1073, 1077 (2d Cir.), *cert. denied,* 444 U.S. 952, 100 S.Ct. 427, 62 L.Ed.2d 323 (1979). It is significant, however, that appellants do not contend that a full presentation of their entrapment defense would have caused the grand jury not to indict. Indeed, the trial judge has labeled that defense "frivolous."

■ It is fundamental that " '[a] grand jury proceeding is not an adversary hearing in which the guilt or innocence of the accused is adjudicated.' " *Ciambrone, supra,* 601 F.2d at 622 (quoting *United States v. Calandra,* 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974)). Furthermore, an indictment is not evidence of guilt, but only a finding of probable cause that a

crime has been committed, and that the accused is reasonably believed to have committed it. *Id.*

■ Although entrapment may be a defense in a criminal trial, the prosecutor is not obligated to present all possible defenses before a grand jury. Nevertheless, an examination of the record reveals that the prosecutor did respond to the grand jurors' questioning about the entrapment defense, and gave a clear example of what constitutes the predisposition necessary to overcome it. The record also reveals that Wilson, the government's agent, testified before the grand jury that Romano stated that he made six or seven trips a year between New York and Palermo to arrange heroin transactions. From the evidence presented and the prosecutor's responses to the inquiries of the grand jurors, it is clear that the prosecutor's actions in this case "fall far short of [the] misleading conduct or deception that would call for dismissal of the indictment ...." *Ciambrone, supra,* 601 F.2d at 623.

■ Even if it were to be assumed that there was some impropriety, dismissal of the indictment is not warranted. In view of the defendants' conviction by the petit jury after a full adversarial hearing on appellants' entrapment defense, it is extremely unlikely that the grand jury would have failed to indict, even if it had been presented with all the evidence produced at trial. Since the petit jury must have concluded beyond a reasonable doubt that appellants were predisposed to commit the crime and were therefore not entrapped, clearly the grand jury would also have rejected the defense in making the lesser finding of probable cause. Hence, there is no merit to appellants' allegation of prosecutorial misconduct. See *Ciambrone, supra,* 601 F.2d at 625.

■ Finally, appellant Glorioso contends that the recording of the telephone conversations between appellants and Nohra violated international law, Italian law, and the Treaty of Friendship Commerce and Navigation, United States-Italy, 1948, 63 Stat.

2255, TIAS 1965. These contentions are also without merit.

It must be stated at the outset that in this case no peace officer or agent of the United States ever entered Italian territory. Therefore, there was no violation of territorial sovereignty or offense to any State. Moreover, it is not suggested that Italy has asserted any violation of its rights of sovereignty. See discussion in *Gengler,* 510 F.2d at 66–68, and materials on State Responsibility in Bassiouni, *International Extradition in U.S. Law and Practice,* Chapter V, § 5–2, 302 *et seq.* (1983).

Appellants may not claim that any norm or principle of international law is violated by a criminal trial, conducted in meticulous compliance with the law of the land, of a defendant, the citizen of another country, who commits a crime in the territory of the prosecuting state. At the trial, all of appellants' defenses here asserted were heard and considered. Surely, this is not a case in which an alien, a defendant in a criminal trial, may assert a claim for a "denial of justice" even in its broadest sense. See Henkin, Pugh, Schacter, Smit, *International Law* 742–743 (1980); *Restatement (second), Foreign Relations Law of the United States* § 165, Comment (c) (1965); *Restatement, Foreign Relations Law of the United States (Revised)* § 711, Comments (a) and (b) (Tentative Draft No. 3) (1982).

■ In international law an alien may assert a denial of justice only upon a demonstration of grave or serious defects, such as a refusal to grant rights reasonably to be expected by an accused in a criminal trial.[1] Professor J.L. Brierly, in *The Law of Nations* 286 (6th ed. 1963), states that, in a proper sense, "denial of justice is an injury involving the responsibility of the state committed by a court of justice." After citing examples "such as execution without trial ..." he adds that even on a "wider interpretation" of the concept, "the misconduct must be extremely gross." *Id.* at 287.

No one who would read the record on this appeal could conclude that there has been such a manifest injustice as would violate any international standard of justice. In the present case, the court has concluded that the appellants were granted all of the constitutional protections, guarantees and procedural safeguards enjoyed by American citizens. Unless substantial justice has been denied, one scholar has written that "it cannot be said that deviations even from municipal law rules of evidence are deviations from the international standard." D.P. O'Connell, *International Law* 948 (2d ed. 1970).

■ In the absence of a denial of justice, as that concept is understood in public international law, no principle of international law is violated by a state which prosecutes and punishes an alien for a crime committed in its own territory. The power of the state to punish crime is itself a fundamental principle of international law. See *Wisconsin v. Pelican Insurance Co. of New Orleans,* 127 U.S. 265, 289–90, 8 S.Ct. 1370, 1373–74, 32 L.Ed. 239 (1888); 6 M. Whiteman, *Digest of International Law* 88–95, 99–100 (1968).

■ The appellants voluntarily entered the United States and committed a crime within its territory. The operative facts which constituted the crime charged, and of which the appellants were found guilty, took place in the United States. Since the corpus delicti was in the United States, and the appellants were granted a fair trial in accordance with applicable principles of constitutional and procedural law, a claim that the conviction and sentence that followed violated international law is without substance or merit.

■ Certain provisions of the Italian Code also have been cited for the contention that there has been a violation of Italian law. The Italian Penal Code provides that it is a crime for any person to "gain knowledge by fraudulent means of a telephone

---

1. See rights of a person charged with a criminal offense, in International Covenant on Civil and Political Rights, General Assembly of the United Nations, G.A.Res. 2200 (XXI), December 16, 1966, quoted in 8 M. Whiteman, *Digest of International Law* 723 (1967).

conversation or telegraphic message between other persons, or of a communication not addressed to him." Italian Penal Code Art. 617. Article 617 *bis* prohibits the unauthorized installation of equipment for the purpose of intercepting telephonic communications.

In this case the equipment to intercept and record the telephonic communication was installed in New York, and not in Italian territory. Moreover, it is a basic principle of Italian law that the penal laws of Italy have no extraterritorial application except under certain well-defined exceptions. See Articles 6, 7 and 10 of the Italian Penal Code. See also A. Pagliaro, *Principi Di Diritto Penale* (Parte Generale) 140 *et seq.* (2d ed. 1980). Appellants, furthermore, may not urge the application of the Italian criminal laws in the courts of the United States. In the words of Chief Justice Marshall in *The Antelope,* 23 U.S. (10 Wheat.) 66, 123, 6 L.Ed. 268 (1825), "[t]he courts of no country execute the penal laws of another . . . ." See *Huntington v. Attrill,* 146 U.S. 657, 666, 13 S.Ct. 224, 227, 36 L.Ed. 1123 (1892); *Wisconsin v. Pelican Insurance Co. of New Orleans,* 127 U.S. 265, 290, 8 S.Ct. 1370, 1374, 32 L.Ed. 239 (1888).

Since the recording of appellants' conversations with Nohra took place within the United States, questions of illegality under Italian law are immaterial. "[I]t is not the route followed by foreign communications which determines the [applicable law]; it is where the interception took place." *United States v. Cotroni,* 527 F.2d 708, 711 (2d Cir.1975). The interception here complained of took place in the United States, and, therefore, it is the law of the United States concerning the legality of wiretaps which is controlling. It cannot be contested that the taping, done with the consent of one of the parties, Nohra, was lawful, and consequently admissible as evidence in a criminal trial under United States law. 18 U.S.C. § 2511(2)(c) & (d); *United States v. Mendoza,* 574 F.2d 1373, 1377 (5th Cir.), *reh'g denied,* 579 F.2d 644, *cert. denied,* 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661 (1978); *United States v. Wright,* 573 F.2d 681, 684 (1st Cir.), *cert. denied,* 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978); *United States v. Proctor,* 526 F.Supp. 1198, 1201 (D.C.Hawaii 1981). See also *United States v. White,* 401 U.S. 745, 749, 91 S.Ct. 1122, 1124, 28 L.Ed.2d 453 (1971).

Italian law reveals that the offense for which they have been charged and found guilty also violates strong Italian public policy. Contrary to appellants' assertions, specific provisions of Italian law permit public officials in the investigation of drug trafficking to intercept telephone conversations upon authorization by a court or public prosecutor. Code of Penal Procedure Article 226 *bis* (2). In addition to a respect for rights of privacy (see Italian Constitution, Article 15), Italy shares with the United States a deep aversion to drug trafficking. See, e.g., *Case against Buscetta,* 64 Rivista di Diritto Internazionale 174 (1981) (Corte di Cassazione, Criminal Section, February 19, 1979) in which the Italian court upheld a conviction of Buscetta, an Italian national, for narcotics trafficking in the United States. See Riesenfeld, in 77 Am.J.Int.L. 164 (1983).

■ Finally, the recording of the conversations did not violate the United States-Italian Treaty of Friendship Commerce and Navigation. Article VI of that treaty provides, in part, that as to allegedly unlawful searches and seizures, the citizens of each high contracting party be treated no less favorably than the nationals of the other high contracting party.[2] The cited article

2. "The dwellings, warehouses, factories, shops and other places of business, and all premises there appertaining, of the nationals, corporations and associations of either High Contracting Party, located in the territories of the other High Contracting Party, shall not be subject to unlawful entry or molestation. There shall not be made any visit to, or any search of, any such dwellings, buildings or premises, nor shall any books, paper or accounts therein be examined or inspected, except under conditions and in conformity with procedures no less favorable than the conditions and procedures for nationals, corporations and associations of such other High Contracting Party under the applicable laws and regulations within the territories thereof." 63 Stat. 2255, TIAS 1965.

makes no reference to the interception of telephonic communications. Nevertheless, appellants here have been accorded all the rights granted to American citizens in similar circumstances. The legality of the taping of appellants' conversations with Nohra has been determined under the same standards which would govern the taping of conversations between American citizens. Appellants have been indicted by a grand jury, have been granted a full and fair trial by jury, during which all defenses asserted were considered, and have been heard on this appeal. It cannot be questioned that United States treaty obligations have been honored in full.

In sum, appellants were tried and convicted of a crime committed in the United States and punishable under its laws. They have not established a deprivation of due process or prosecutorial misconduct. Furthermore, there has been no violation of international law, Italian law, or of United States-Italian treaty obligations.

Since all contentions of appellants are without merit, we affirm the judgments of conviction.