Roberto CHARRIS, Petitioner,

v.

Christopher P. ARTUZ, Superintendent, Green Haven Correctional Facility, Respondent.

No. 98 Civ. 5541(CLB).

United States District Court, S.D. New York.

Dec. 29, 1998.

Edward A. Gabel, III, Palmer & Gabel, Poughkeepsie, NY, for Roberto Charris.

District Attorney, Putnam County by Asst. Atty Gen. Dian Kerr McCullough, New York City, for Christopher P. Artuz.

*Memorandum & Order*

BRIEANT, District Judge.

By his petition, docketed August 4, 1998, Roberto Charris, a New York State prisoner currently incarcerated at Green Haven Correctional Facility in Stormville, New York, seeks federal habeas corpus relief under 28 U.S.C. § 2254, collaterally attacking his state court conviction. For the reasons set forth below, the petition is denied.

### Background

Mr. Charris seeks to review a conviction on January 4, 1989, in the County Court of the County of Putnam. After a non-jury trial conducted by the Hon. William B. Braatz, County Judge, petitioner was convicted of one count of criminal possession of a controlled substance in the first degree in violation of New York State Penal Law § 220.21(1), arising out of his possession and agreement to sell two kilograms of cocaine to a police informant. Mr. Charris was sentenced to a term of imprisonment of twenty (20) years to life.

Following his conviction and sentencing in the County Court, Mr. Charris sought appellate review within the state system. On direct appeal, Mr. Charris raised issues of violation of due process of law based on unconscionable police conduct; excessive sentence in violation of Eight Amendment protection against cruel and unusual punishment; and failure to suppress evidence. Mr. Charris's conviction was unanimously affirmed on direct appeal by the Appellate Division of the Supreme Court, Second Judicial Department on August 5, 1991. *See People v. Charris*, 175 A.D.2d 808, 572 N.Y.S.2d 935 (2d Dept.1991). The Court of Appeals of New York denied leave for further appellate review on March 30, 1992. *See People v. Charris*, 79 N.Y.2d 945, 583 N.Y.S.2d 199, 592 N.E.2d 807 (1992).

On November 2, 1995, petitioner made a *coram nobis* motion to the trial court pursuant to New York Criminal Procedure Law § 440.10 seeking to vacate the judgment. Petitioner claimed that he was denied effective assistance of counsel in violation of the Sixth Amendment. On April 21, 1997, the Putnam County Court (Braatz, J.) issued a decision and order denying the CPL 440.10 motion. On August 7, 1997, the Appellate Division, Second Department denied petitioner's application for leave to appeal from the CPL 444.10 result

Mr. Charris has raised three arguments in support of his petition: 1) ineffective assistance of counsel; 2) violation of due process of law based on unconscionable police conduct; and 3) excessive sentence in violation of the Eighth Amendment. By a Rule 4 Memorandum and Order dated September 8, 1998, this Court directed that respondents file an answer or motion within thirty (30) days, and submit the transcripts of all the relevant proceedings, the briefs submitted on appeal, and the record in any state post-conviction proceedings. Familiarity on the part of the reader with the underlying facts and all prior proceedings in this case is assumed.

## Discussion

### I. Effective Assistance of Counsel

Petitioner's claim of ineffective assistance of counsel is based on the allegation that his lead trial counsel, the now deceased Peter P. Tavolacci, encouraged him to reject a plea bargain of an eight (8) year sentence. Petitioner admits in his sworn affidavit that on the night before the jury was to be selected, Mr. Tavolacci, and his co-counsel, Mr. Whalen, conducted an approximately 30—45 minute-long meeting with petitioner on the subject of accepting a plea bargain. Both counsel informed petitioner that there was a plea offer available to him that would have entitled him to an eight (8) year sentence. Mr. Whalen told petitioner that since he was facing a minimum sentence of fifteen (15) years, petitioner should plead guilty. While Mr. Whalen may have been the one to actually inform petitioner about the plea offer, Mr. Tavolacci was at the meeting and did inform petitioner that the "It's up to you"; "Anything can happen", and "You never know". Petitioner also claims, however, that Mr. Tavolacci assured petitioner that he could do better than the eight year offer by proceeding to trial and taking an appeal. Petitioner was also informed that if he did not make his decision then, the offer would be withdrawn upon the commencement of trial.

The Sixth Amendment right to counsel attaches at all critical stages in the proceedings "after the initiation of formal charges," *Moran v. Burbine,* 475 U.S. 412, 431, 106

S.Ct. 1135, 89 L.Ed.2d 410 (1986), which has been held to include plea negotiations. *See Boria v. Keane,* 99 F.3d 492, 496–97 (2d Cir.1996) *cert. denied* —— U.S. ——, 117 S.Ct. 2508, 138 L.Ed.2d 1012 (1997)(holding that ineffective assistance of counsel during plea negotiations justified § 2254 habeas relief). Petitioner must satisfy a two prong test in order to show ineffective assistance of counsel: (1) that counsel's representation fell below an objective standard of reasonableness measured by the prevailing professional norms; and (2) that there is a reasonable probability that, but for counsel's unprofessional performance, the outcome of the proceeding would have been different. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also United States v. Gordon,* 156 F.3d 376 (2d Cir.1998). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674.

Our Court of Appeals has held that " '[t]he decision whether to plead guilty or contest a criminal charge is ordinarily the most important single decision in a criminal case. *This decision must ultimately be left to the client's wishes* ... counsel may and must give the client the benefit of counsel's professional advice on this crucial decision.' " *Boria,* 99 F.3d at 496–97 (*quoting* Anthony G. Amsterdam, Trial Manual 5 for the Defense of Criminal Cases (1988))(emphasis added).

The Supreme Court has held that "[j]udicial scrutiny of counsel's performance must be highly deferential," *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, and that "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* In *Boria,* trial counsel "had not in any way or at any time discussed with the petitioner the advisability of accepting or rejecting the offered plea." 99 F.3d at 495. Thus, our Court of Appeals refused to extend the *Strickland* Court's "strong presumption" to a lawyer who had failed to give his constitutionally-compelled "professional advice on this decision." 99 F.3d at 498. This Court is not faced with the dereliction of duty that the *Boria* Court faced, as both Mr. Whalen and

Mr. Tavolacci advised petitioner on whether to accept or deny the plea offer. As such, this Court is not bound by *Boria* to the extent that it refused to apply the "strong presumption."

■ Mr. Tavolacci clearly informed petitioner of the minimum sentence that he faced should he lose at trial. *See Gordon,* 156 F.3d at 380 ("knowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty.")(internal citations omitted). Likewise, accepting petitioner's allegations as true, he received not only Mr. Tavolacci's opinion, but Mr. Whalen's opinion, as well. Thus, petitioner was given an exhaustive view of the benefits and risks of accepting or declining the plea offer to formulate a decision that was ultimately his to make.

■ The New York Court of Appeals has told us long ago, "[A] wisdom developed after an event, and having it and its consequences as a source, is a standard no man should be judged by." *Costello v. Costello,* 209 N.Y. 252, 262, 103 N.E. 148 (1913). Thus, this Court should not measure the quality of Mr. Tavolacci's advice based on the ultimate event that petitioner was convicted, and had his appeals denied. That in mind, combined with the "strong presumption", this Court refuses to find that Mr. Tavolacci's alleged advice to refuse the plea offer of eight (8) years fell below an objective standard of reasonableness measured by the prevailing professional norms.

## II. Outrageous Government Conduct

■ Petitioner next claims that his due process rights were violated because of the outrageous conduct of the Putnam County Sheriff's Office, through its informant, which caused petitioner's criminal possession of two kilograms of cocaine to occur in New York as opposed to Connecticut, where the minimum prison sentence is only five (5) years as compared to fifteen (15) years in New York.

An informant, one Estupinan, had been arrested himself by the Narcotics Task Force of the Putnam County Sheriff's Department for sale on March 30, 1998, of a pound of cocaine to an undercover. He was working off his case. He told New York authorities that he knew of one "Juan" in Danbury, Connecticut who was able to supply large quantities of the white crystalline powder. Under direction of the Task Force, Estupinan telephoned the Connecticut number of "Juan" on April 12, 1988, and told an unidentified person who answered that he wished to purchase four or five pounds of cocaine. He was told to call back later, and did so. This time he spoke with petitioner, who agreed to meet with Estupinan at 6:00 P.M. at El Borracho Restaurant in Brewster, New York. At this meeting, Petitioner agreed to sell Estupinan two kilos of cocaine to be delivered against payment the following day at a nearby bowling alley. Petitioner set the time (4:00 P.M.) and in the course of an intervening phone call, increased the price by $3,000. When Estupinan first met Petitioner he thought Petitioner was "Juan" and so addressed him. Petitioner corrected this misapprehension and gave his correct name to the undercover informant. Petitioner changed the location several times, ultimately designating a location for delivery near Sciortino's Restaurant in Brewster, New York. In the midst of the transaction, after Petitioner had displayed two kilo bricks of cocaine, he was arrested.

There was no evidence of any official misconduct in setting the venue for the sale. It was Petitioner's choice as to where he would deliver the narcotics. He proved this by making last minute changes in the location of the sale. Clearly, Petitioner knew that his customer was in New York. Delivery of the goods C.O.D. to the buyer at the buyer's location is not unusual, either in legitimate commerce or in the drug trade. Although "Juan" apparently was not Estupinan's source of drugs, Estupinan knew that "Juan" dealt in large quantities and was in possession of "Juan's" telephone number. It was Estupinan, not the Task Force, who gave up and targeted "Juan," and it was not unreasonable for the Task Force to believe that "Juan" was his source.

The Task Force understood that dealers and suppliers from the nearby Danbury, Connecticut area were present from time to time in the Brewster area. Danbury, Connecticut is only 12.7 miles by superhighway from Brewster, New York, and is the nearest large commercial center and shopping area which serves Brewster, contrasted with White Plains, New York which is more than thirty miles away, and smaller Mt. Kisco, New York, at 19.7 miles. Essentially, although separated by the state line they are part of a single commercial area of which Danbury is the center, both for legitimate transactions and crime. Petitioner knew from the inception of the negotiations that he was to deliver in New York State. There was no pressure of any kind, apart from his own greed, placed on him by Estupinan or anybody else to perform the deal in New York or elsewhere. In no sense was he inveigled into the State by the Task Force. Doubtless he heard of the so-called Rockefeller drug laws, and knew that Connecticut has a more lax view of the cocaine trade. Possibly the extra risk of delivery in New York motivated his increase in the price after the transaction was first agreed to.

The Court concludes that this case presents no factual basis for a finding of outrageous official conduct, and that there is no federal due process violation.

■ There are significant differences between a claim of entrapment and a claim of outrageous governmental conduct. A successful entrapment defense requires that a defendant convince the fact-finder that government agents induced him to commit an offense that he was not otherwise predisposed to commit. *Mathews v. United States,* 485 U.S. 58, 62–63, 108 S.Ct. 883, 886–87, 99 L.Ed.2d 54 (1988). A defendant who advances an entrapment defense before the trier of fact unsuccessfully may nonetheless succeed in mounting a successful attack based upon a showing of governmental conduct that is found by the court to be outrageous. *United States v. Cuervelo,* 949 F.2d 559, 565 (2d Cir.1991); *United States v. Romano,* 706 F.2d 370, 372 (2d Cir.1983).

■ The concept of fairness embodied in the Fifth Amendment due process guaranty is violated by government action that is fundamentally unfair or shocking to our traditional sense of justice, *see Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 246, 80 S.Ct. at 303–04, 4 L.Ed.2d 268 (1960), or conduct that is "so outrageous" that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction against the accused. *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973); *see United States v. Schmidt,* 105 F.3d 82, 91 (2d Cir.1997). But, as Justice Powell in his concurring opinion in *Hampton* stated, "[p]olice over involvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction." *Hampton v. United States,* 425 U.S. 484, 495 n. 7, 96 S.Ct. 1646, 1653, 48 L.Ed.2d 113 (1976).

■ The outrageousness of the government's conduct must be viewed "standing alone" and without regard to the defendant's criminal disposition. *United States v. Chin,* 934 F.2d 393, 398 (2d Cir.1991). Ordinarily such official misconduct must involve either coercion, *Watts v. Indiana,* 338 U.S. 49, 55, 69 S.Ct. 1347, 1350, 93 L.Ed. 1801 (1949) (six days of intense interrogation of accused), or violation of the defendant's person, *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209–10, 96 L.Ed. 183 (1952) (forcible extraction of accused's stomach contents). Absent such extreme misconduct, relief in the form of reversal of a conviction is rare. *United States v. Myers,* 692 F.2d 823, 837 (2d Cir. 1982); *United States v. LaPorta,* 46 F.3d 152, 160 (2d Cir.1994). This Court declines to find that the alleged government conduct is so outrageous as to violate petitioner's due process rights.

■ The only support for petitioner's argument is a New York Court of Appeals case which held that inexplicable and reprehensible police misconduct which included "violence and deception, culminating in the further deceitful luring of a Pennsylvania

resident into New York solely to make a sale of cocaine" was a due process violation under the New York Constitution, Article I, § 6. *People v. Isaacson*, 44 N.Y.2d 511, 514, 519–20, 406 N.Y.S.2d 714, 718, 378 N.E.2d 78, 82 (1978). Initially, this Court concludes that petitioner's factual claims do not rise to the level of police misconduct that underlie the holding in *Isaacson.* Additionally, this Court observes that the New York Constitution, like the United States Constitution, contains a "due process clause," *see* N.Y. Const. Art. 1, § 6, and that the substantive contours of New York's due process clause are now believed to be not in all respects coterminous with the federal due process clause, *see People v. Isaacson*, 44 N.Y.2d 511, 519–20, 406 N.Y.S.2d 714, 718, 378 N.E.2d 78, 82 (1978). Thus, governmental conduct may, in a given case, violate New York principles of due process, but not federal principles of due process. On the present facts, this Court is unwilling to extend the *Isaacson* doctrine to the Due Process Clause of the United States Constitution.

### III. Excessive Sentence Claim

Upon his conviction for one count of criminal possession of a controlled substance in the first degree in violation of New York State Penal Law § 220.21(1), a class A–I felony, arising out of his possession and agreement to sell two kilograms of cocaine to a police informant, Mr. Charris was sentenced to a term of imprisonment of twenty (20) years to life. As a first time felony offender, under New York law, the maximum sentence was life imprisonment; the minimum sentence was not less than fifteen years and no more than twenty-five years. N.Y.Penal Law §§ 70.00(2)(a), (3)(a)(i) (McKinney 1998). Mr. Charris argues that the lesser sentence he received was "cruel and unusual" and thus violated the Eighth Amendment. There is no merit to Mr. Charris' allegations. "No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law." *See White v. Keane*, 969 F.2d 1381, 1383 (2d Cir.1992).

### Conclusion

Based on the foregoing reasons, the petition is denied. The Clerk shall enter a final judgment.

SO ORDERED.