**UNITED STATES of America**

v.

**James LEONARD, Donald Brown, Robert Seyfert and John Papajohn, Jr.**

No. 91–1251.

United States District Court,
E.D. New York.

Dec. 22, 1992.

Andrew J. Maloney, U.S. Atty., Eric Corngold, Asst. U.S. Atty., Brooklyn, NY, for plaintiff.

Joseph K. Garneau, West Hempstead, NY, for James Leonard.

Robert M. Simels, New York, NY, for Donald Brown.

Lee Ginsberg, New York City, for Robert Seyfert.

James Michael Merger, Boston, MA, for John Papajohn, Jr.

HURLEY, District Judge.

In the above-referenced prosecution, James Leonard ("Leonard"), Donald Brown ("Brown"), Robert Seyfert ("Seyfert"), and John Papajohn, Jr. ("Papajohn"), are charged in a one-count superseding indictment with conspiring to distribute and to possess with intent to distribute hashish, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C). Currently before the Court are various pretrial motions made both individually and collectively by defendants. Within this Memorandum and Order, the Court addresses those aspects of the motions discussed below.

## BACKGROUND

The factual background of this case, as described by the government, is as follows. A confidential informant, ("CI"), working with the United States Drug Enforcement Administration, ("DEA"), was given Leonard's name in the fall of 1990 by a narcotics trafficker living in Pakistan. The trafficker

allegedly informed the CI that Leonard owed money to the trafficker for a quantity of heroin previously supplied to Leonard. Consequently, the trafficker asked the CI to obtain the money owed him.

Sometime during October of 1990, the CI contacted Leonard and initiated a series of telephone conversations and meetings. Throughout these communications, various narcotics transactions were discussed by the parties. In August of 1991, the CI informed Leonard that he had arranged to import two tons of hashish into the United States. Apparently, the CI indicated to Leonard that he had 500 kilograms of the hashish available for sale; Leonard then indicated that he would procure buyers for the hashish.

On September 12, 1991, the CI arranged to give Leonard a sample of the available hashish. At a location in Brooklyn, New York, the CI, along with two undercover DEA agents, met with Leonard in a van which contained approximately 500 kilograms of hashish. During the meeting, which was video and tape recorded, Leonard inspected the hashish and took approximately one-half kilogram as a sample. Thereafter, on September 15, 1991, Leonard met with the CI on Staten Island. At the meeting, which was recorded, Leonard and the CI discussed the details of the transaction, ultimately agreeing to a price of $1,300 per pound. The government further alleges that at that meeting of September 15, 1991, Leonard spoke by telephone with an individual subsequently identified as Brown. In that connection, Leonard informed the CI that Brown was attempting to meet "the Canadians," who were purportedly going to buy most of the available 500 kilograms of hashish.

On September 19, 1991, the CI met with Leonard in a recorded meeting on Staten Island, at which Leonard gave the CI approximately $100,000 as partial payment for an initial three hundred pounds of the hashish. Leonard and the CI then agreed to meet later during that day, at which time Leonard would give the CI the balance of the money due for the initial three hundred pound purchase. Later that afternoon, Leonard and the CI met at the same location. After the CI refused to produce a portion of the hashish absent full payment, Leonard indicated that he would get the balance of the money for the three hundred pounds of hashish.

Approximately two hours later on that same afternoon of September 19, 1991, Leonard met with the CI again. Leonard stated that he would go down the road to retrieve the balance of the money for the transaction. Agents then followed Leonard, who drove a silver Pontiac, to a Holiday Inn Motel, where Leonard used a pay telephone and then returned to his car. At approximately 6:50 P.M., the agents observed a red Chrysler with two men inside park directly in front of Leonard's car. At that point, Leonard exited his car and, approaching the red Chrysler, pointed to a parking lot across the street. Leonard then drove to the parking lot, as did the red Chrysler, which drove in an "erratic fashion" according to the government. The agents then observed the two cars park adjacent to each other in the parking lot for several minutes, after which time the silver Pontiac drove away. Surveillance of the red Chrysler was maintained.

Other agents followed the silver Pontiac to the location where the CI had previously met Leonard. Leonard then met with the CI and gave the CI a box containing approximately $200,000 in United States currency. Thereafter, Leonard was arrested.

The agents maintaining surveillance of the red Chrysler observed that the occupants of the car had left the vehicle. The agents then entered a nearby restaurant and asked two patrons how they arrived; the customers responded that they had arrived in the red Chrysler. At that point, the two individuals, later identified as Seyfert and Papajohn, were arrested. At the time of the arrest, the agents found keys to the red Chrysler and approximately $10,000 in United States currency on Papajohn's person. A small quantity of hashish was discovered on Seyfert's person. The government further asserts that Papajohn's palm print was subsequently found on one of the bags of currency given to the CI by Leonard.

Following his arrest, Leonard made various post-arrest statements, some of which

inculpated Brown. More specifically, Leonard revealed certain details regarding transactions with Seyfert, Brown, and an individual identified as "Paul." Subsequent to Leonard's arrest, Brown contacted a DEA agent ("Agent Cipriano") and later met with the agent in New York. At that meeting, which took place on September 23, 1991, Brown allegedly stated that Leonard had approached him (Brown) several months earlier in regard to a hashish transaction. Brown further stated, according to the government, that he thereafter contacted a potential Canadian buyer of the hashish, but after some initial negotiating and a meeting with Leonard, Brown decided he "did not like the deal." Govt's Memo. in Opp. at 9.

As indicated above, all defendants currently move for various types of pre-trial relief.

## DISCUSSION

### I. *Brown's Motion to Suppress*

#### A.

Brown moves to suppress statements made at the time of an interview with DEA agents on September 23, 1992, as well as to suppress statements made by him in a subsequent telephone conversation of September 27, 1992. Given the nature of Brown's motion, it is necessary to examine the facts surrounding the interview of September 23 with some detail.

According to an affidavit filed by Brown, a relationship between Brown and DEA Special Agent Mario Sessa ("Agent Sessa") and Agent Cipriano has existed since 1979. At that time, Brown was the subject of an investigation and subsequent indictment involving the DEA, and more specifically, Agent Cipriano. It is Brown's assertion that Agent Cipriano did not approve of a cooperation agreement ultimately struck between Brown and the government in relation to the 1979 investigation, and that since that time, Agent Cipriano has felt animosity towards Brown.

Brown asserts that during the summer of 1991, while living in Texas, he communicated with a friend in New York who informed Brown of a possible heroin importation scheme taking place at John F. Kennedy International Airport in Queens, New York.

Brown contends that he agreed to act as an intermediary with the DEA and inform them of the scheme. As a result, Brown was eventually put in contact with Agent Cipriano, who allegedly directed Brown to come to New York and discuss the matter, which Brown did. At the meeting, Agent Cipriano admonished Brown not to discuss the matter with anyone else.

Subsequently, Brown did in fact mention the matter to defendant Leonard, an individual known by Brown for nearly thirty years, and a person Brown had been speaking to during that period. It is Brown's contention that his "indiscretion" in mentioning the matter to Leonard, in contravention of Agent Cipriano's directions, fueled the current prosecution. Brown further alleges that at that time he was unaware of Leonard's dealings with the CI in the current case. In any event, Brown came to New York in September of 1991 "to see [his] parents and to conduct a further search for a restaurant location." Aff. of Donald Brown at ¶ 12. During that visit, Brown met Leonard at a bar in Queens, New York, at which time Leonard allegedly revealed his scheme to broker the hashish transaction which forms the basis for the current indictment. Brown asserts that he expressed no interest in the deal, although he took a small sample of the hashish at Leonard's insistence.

The following day, Brown again spoke to Leonard, and informed Leonard of his (Brown's) suspicions that the arrangements of the potential transaction "sounded like a government sting." *Id.* at ¶ 13. On the next day, Brown returned to Texas, where he was searched by DEA agents at the airport in Dallas. Brown contends that the search prompted him to contact Leonard and urge him to abandon the hashish transaction, although eventually Leonard allegedly informed Brown that he was going to proceed with the participation of defendant Seyfert. At that point, Brown asserts that he called Seyfert, another long-time acquaintance, and cautioned him to terminate the deal.

After Brown learned of the arrests of Leonard and Seyfert for the instant offense, he was allegedly told by Leonard that Agent

Cipriano inquired of Leonard as to Brown's role in the conspiracy. *Id.* at ¶ 15. Consequently, according to Brown, he returned to New York and spoke to Agent Cipriano, who advised Brown to come to DEA offices to discuss the matter. Thereafter, Brown contacted Agent Sessa, apparently a less hostile agent in Brown's perception, and inquired whether Agent Sessa believed Brown was required to attend such a meeting. According to Brown, Agent Sessa told him that if he did not appear, he would "in all probability be immediately arrested," *Id.* at ¶ 16. At one point during these conversations, Brown contends that Agent Cipriano assured him that Agent Sessa would be present at the meeting. On September 23, 1991, Brown went to the DEA offices in New York for the meeting. It is Brown's contention that he fully believed that he would be arrested if he failed to appear. *Id.* at ¶ 17. Brown asserts that Agent Cipriano and the case agent for the instant prosecution were present, although Agent Sessa was not. Furthermore, Brown contends that the meeting was hostile in tone, and that he "could not leave the meeting had [he terminated] the discussion, but that [he] was in a custodial setting." *Id.* Nowhere does Brown assert that he was placed under arrest, or that he was actually prohibited from leaving. According to a report subsequently filed by Agent Cipriano, Brown made various statements during the meeting which indicated that Brown sought and actually contacted a potential buyer of the hashish. *See* Govt's Memo. in Opp. at exhibit D. That Brown was not informed of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), during the course of the meeting is not in dispute.

Brown claims that he "now" knows that he was a target of the investigation at the time of the meeting on September 23, 1991. During the meeting, Brown allegedly informed Agent Cipriano of an unrelated narcotics deal about which he had information. It is asserted that Agent Cipriano told Brown that he could leave at the conclusion of the meeting, and instructed him to call in a few days about the other narcotics deal. On September 27, 1991, Brown called Agent Cipriano as directed; that conversation was recorded by Agent

Cipriano. According to Brown, Agent Cipriano made further inquiry about the instant case during that conversation. *Id.* at ¶ 19. As noted above, Brown moves to suppress the statements made at the meeting of September 23, 1991, as well as the statements made during his telephone conversation with Agent Cipriano on September 27, 1991, based on the argument that the statements were involuntary, and that the agents failed to advise Brown of his *Miranda* rights. The government counters that Brown was not in custody for *Miranda* purposes on either occasion, and that the statements were voluntary and therefore admissible.

■ It is well-established that the familiar warnings required to be issued by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), need only be given to one subject to "custodial interrogation." *Id.* at 444, 86 S.Ct. at 1612. As originally defined by the *Miranda* Court, "custodial interrogation ... [means] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.; see also Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *California v. Beheler,* 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). Through subsequent interpretation, the Supreme Court has had opportunity to review the parameters of "custodial interrogation."

From a general perspective, it has been noted that a "police-dominated atmosphere ... is said to generate 'inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'" *Illinois v. Perkins,* 496 U.S. 292, 296, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990) (quoting *Miranda,* 384 U.S. at 467, 86 S.Ct. at 1624). However, strict compliance with *Miranda* need be maintained " 'only in those types of situations in which the concerns that powered the decision are implicated.'" *Id.* (quoting *Berkemer,* 468 U.S. at 437, 104 S.Ct. at 3148). Thus, in the following instances—which may appear at first blush to have indicated a need for the *Mi-*

*randa* warnings—the Supreme Court has rejected such a requirement based on the reasoning that the interviewee was not in a custodial setting.

In *Mathiason,* the victim of a burglary suggested to state police that the defendant may have been involved. 429 U.S. at 493, 97 S.Ct. at 713. Thereafter, police left a card at the defendant's apartment asking the defendant to call them. Upon calling the police, the defendant agreed to come to a state patrol office. After arriving at the state patrol office, the defendant was taken into a room with an officer and specifically informed that he was not under arrest. The officer advised the defendant that police believed he was involved with the burglary, and that the defendant's fingerprints were found at the scene. Although the latter point was not true, the defendant shortly confessed to the burglary. Following the confession, the defendant was advised of his *Miranda* rights, gave a taped confession, and released. *Id.* at 494, 97 S.Ct. at 713.

In concluding that the initial questioning of the defendant was noncustodial, the *Mathiason* Court considered that: (1) the defendant voluntarily went to the station; (2) the defendant was told specifically that he was not under arrest; and (3) the defendant left the station without hindrance after the interview. *Id.* at 495, 97 S.Ct. at 714. The Court reasoned that the inherently coercive nature of police questioning a suspect does not give rise to a per se "restriction on ... freedom" so as to render an interrogation custodial for *Miranda* purposes. *Id.*

In *Beheler,* the defendant himself contacted police after being involved in a theft which led to murder. 463 U.S. at 1122, 103 S.Ct. at 3517. The defendant then agreed to accompany police to the station house and was interviewed for thirty minutes, although he was not advised of his *Miranda* rights. After that interview, the defendant was permitted to leave. In rejecting the lower court's ruling which held that the *Miranda* warnings were required, a per curiam Court emphasized that the defendant's status as a suspect and the fact that the questioning occurred at a station house were not factors sufficient to trigger *Miranda. Id.* 463 U.S. at 1125, 103

S.Ct. at 3520 (citing *Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714).

■ In light of the above-cited authority, which offers some guiding principles regarding the determination of custodial interrogation, it is important to note that those principles must be considered in the light of the Supreme Court's caution that "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer,* 468 U.S. at 442, 104 S.Ct. at 3151 (citing *Beckwith v. United States,* 425 U.S. 341, 346–47, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1976)) (further citation omitted). Furthermore, as a general matter the government bears the burden of demonstrating "by a preponderance of the evidence that a suspect waived his *Miranda* rights, and that his confession is truly the product of free choice." *United States v. Anderson,* 929 F.2d 96, 99 (2d Cir.1991) (citing *Colorado v. Connelly,* 479 U.S. 157, 168–69, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986)).

■ Turning to address Brown's telephone call with Agent Cipriano on September 27, 1991, the Court is convinced that the discussion which took place did not occur under conditions constituting "custodial interrogation." It is immediately clear that during the telephone conversation, Brown was neither under formal arrest nor under a " 'restraint of freedom of movement.' " *Beheler,* 463 U.S. at 1125, 103 S.Ct. at 3520 (quoting *Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714); *see also United States v. Kirsteins,* 906 F.2d 919, 923 (2d Cir.1990) (noting that "the governing inquiry in assessing the custodial quality of an interrogation for *Miranda* purposes is an objective one ... focus[ing] on whether a reasonable person in the same situation would have believed that he was not *free to leave* ") (emphasis added) (citations omitted). Since the telephone call did not amount to a custodial interrogation, *Miranda* warnings were not required and the statements made by Brown at the time will not be suppressed on that basis.

The interview of September 23, 1991, gives the Court greater pause with respect to the issue of custodial interrogation. Although the Supreme Court has repeatedly held that the facts that one is a suspect, or that ques-

tioning takes place in a police station and in a coercive atmosphere, do not in and of themselves require the instruction of *Miranda* warnings, it is equally true that "the circumstances of each case ... influence a determination of whether a suspect is 'in custody'...." *Beheler*, 463 U.S. at 1125, 103 S.Ct. at 3520.

In the instant case, Brown's history with Agent Cipriano and the fact that Sessa allegedly informed Brown that he would be arrested if he failed to appear are factors which arguably would cause a reasonable man to believe that he was under significant restraint from freedom of movement at the time of the meeting. On the other hand, Brown himself initiated the contact with the DEA, and he does not allege that he was placed under arrest or prohibited from leaving the meeting at any time. Furthermore, it is alleged that the meeting lasted approximately thirty minutes, and that Brown left without hindrance at its conclusion. These factors support a finding that Brown was not in custody for *Miranda* purposes.[1]

Other points made by the government at a conference before this Court lend further support to the argument that Brown was not in custody. First of all, the government does not concede that Agent Sessa ever indicated to Brown that he would be arrested if he failed to appear. Secondly, the government indicated that at the meeting of September 23, 1991, DEA Agent Falsey, (the other agent attending with Agent Cipriano), indicated to Brown, in substance, that Brown did not have to be at the meeting if he did not desire to be there. *See* Transcript of Hearing of Oct. 23, 1992 at 102.

In the Court's view, the bulk of the factors discussed above appear to support the conclusion that Brown was not in custody; however, some clarification is required with respect to certain disputed facts. Accordingly, a hearing will be held to address the circumstances surrounding the meeting of September 23, 1991; the scope of the hearing will be narrow. Since the alleged statement by Agent Sessa regarding possible arrest causes the Court some concern, testimony regarding that alleged statement, as well as any statements made by the agents at the meeting itself, will be addressed at the hearing. Until such time as the hearing is concluded, the Court defers ruling on Brown's motion to suppress his statements of September 23, 1991. As noted above, the motion to suppress statements made during the September 27, 1991 telephone call is denied.

### B.

In anticipation of the hearing to be held on Brown's motion to suppress, Brown issued a subpoena duces tecum to the Department of Justice pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure. That subpoena seeks, *inter alia:* the complete file compiled by the DEA on Brown; the personnel file of Agent Cipriano; all documentation relating to Agent Cipriano's involvement in the instant case; and all DEA manuals or memoranda relating to procedures for the interviewing of suspects and informants. *See* Letter from Robert M. Simels to the Court, dated Oct. 22, 1992 at exhibit A. The government requests that the subpoena be quashed.

In *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), the Court reviewed the factors to be considered in assessing a Rule 17(c) subpoena. Those factors include: (1) the evidentiary nature and relevance of the documents; (2) whether the material sought is otherwise procurable; (3) whether the moving party is capable of preparing for trial without such production in advance of trial; and (4) whether the application is made in good faith and not intended as a "general 'fishing expedition.'" *Id.* at 699–700, 94 S.Ct. at 3103. The *Nixon* Court noted that generally the party seeking production would have to clear the "three hurdles" of relevancy, admissibility, and specificity. *Id.* In addition, the Court reiterated its view that a subpoena duces tecum in criminal

---

1. In addition, the Court notes that at a conference of October 23, 1992, defense counsel argued that Brown's understanding that he was a target, coupled with the fact that Agent Cipriano believed Brown to be a suspect, created a custo-dial situation. *See* Transcript of Hearing, Oct. 23, 1992 at 104. In light of the authority discussed above, such a proposition appears insupportable. *See e.g. Mathiason*, 429 U.S. at 495, 97 S.Ct. at 714.

cases was not intended to provide a means of discovery. *Id.; see also United States v. Noriega*, 764 F.Supp. 1480, 1493 (S.D.Fla. 1991) (noting that "[i]f the moving party cannot reasonably specify the information contained or believed to be contained in the documents sought but merely hopes that something useful will turn up, this is a sure sign that the subpoena is being misused").

■ The subpoena issued by Brown lacks the requisite specificity in many respects. The portions of the subpoena which seek virtually every DEA document relating to Brown is the clearest example, in that the government points out that Brown has had dealings with the DEA for over fifteen years. More importantly, the relevance of almost all the documents sought is open to serious question given this Court's direction that the hearing on Brown's motion to suppress will be narrow in scope. In that connection, DEA manuals and policies will not necessarily shed any light on the factual issues concerning the allegedly custodial nature of the meeting with Brown on October 23, 1991. In light of that fact, and the principles enunciated in *Nixon*, the government's application to quash the subpoena duces tecum is granted.[2]

## II. *Motions to Dismiss for Alleged Grand Jury Misconduct*

Brown moves to dismiss the indictment based on the argument that the government intentionally withheld from the grand jury material exculpatory evidence. In addition, Brown contends that the government affirmatively misled the grand jury by failing to inform the grand jury of Brown's extensive relationship with the DEA, and failing to instruct the grand jury on the concept of withdrawal from a conspiracy. Defendant Papajohn moves to inspect the grand jury minutes, or in the alternative, to dismiss the indictment for failure to inform the grand jury of an allegedly exculpatory statement made by defendant Seyfert. For the reasons stated below, the motions to dismiss the indictment and inspect grand jury minutes are denied.

■ In this circuit, "a prosecutor ordinarily need not submit to the grand jury evidence which may negate a defendant's guilt." *United States v. Casamento*, 887 F.2d 1141, 1183 (2d Cir.1989) (citing *United States v. Ciambrone*, 601 F.2d 616, 622–23 (2d Cir. 1979)), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). Rather, the Second Circuit has held that "[t]he prosecutor should present exculpatory evidence [to the grand jury] where such evidence is 'substantial' and 'where it might reasonably be expected to lead the jury not to indict.'" *Id.* (quoting *Ciambrone*, 601 F.2d at 623). Under this standard, the motions by both Brown and Papajohn fail.

■ As the government points out, none of the alleged omissions cited by Brown fall into the category of substantial exculpatory evidence which might reasonably have led the grand jury not to indict. Specifically, even the fact that Leonard now asserts that he would have testified in the grand jury that Brown was not involved in the conspiracy does not satisfy the requisite standard. Such purportedly exculpatory testimony would have been impeached not only by Leonard's prior statements but also by Brown's statements allegedly made at the meeting of September 23, 1991. Thus, such evidence does not qualify as substantial exculpatory evidence. *See e.g. United States v. Patiwana*, 723 F.Supp. 888, 891 (E.D.N.Y.1989). The same result obtains with respect to other evidentiary points raised by Brown. Furthermore, Brown's argument that the prosecutor should have instructed the grand jury on the concept of withdrawal from a conspiracy is without merit. *See United States v. Romano*, 706 F.2d 370, 374 (2d Cir.1983) (noting that "the prosecutor is not obligated to present all possible defenses before a grand jury").

■ Papajohn's motion to dismiss the indictment for failure to present exculpatory evidence to the grand jury is similarly unavailing. In consideration of what is arguably Papajohn's most compelling point in this re-

---

**2.** Brown's request for Agent Cipriano's personnel file is the subject of a discovery motion which is discussed below.

gard, it is asserted that the grand jury was not provided with an exculpatory statement by Seyfert. In that statement, Seyfert asserts, *inter alia*, that Papajohn was not involved in the transaction and that Papajohn did not know about the transaction. *See* Govt's Memo in Opp. at exhibit C. However, as the government points out, Papajohn's palm prints were allegedly found on a bag containing some of the $200,000 seized at the time of the transaction. Moreover, at the time of his arrest Papajohn was found to have on his person approximately $10,000, packaged similarly to the currency found in the bag containing the balance of the money. Thus, the impeachable evidence offered by Papajohn does not rise to the level of being substantially exculpatory. *Patiwana,* 723 F.Supp. at 891.

■ Even if the evidence cited by Brown and Papajohn were to be considered substantially exculpatory, the applications would fail in light of *United States v. Williams,* —— U.S. ——, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992). In that recent decision, the Court centered its reasoning on the fact that the grand jury acts as an accusatory—rather than adjudicatory—body. *Id.* at ——, 112 S.Ct. at 1742–44. Thus, in light of the fact that a suspect has never "been thought to have a right . . . to have exculpatory evidence presented," *id.* at ——, 112 S.Ct. at 1744 (citations omitted), the Court determined that "[i]mposing upon the prosecutor a legal obligation to present exculpatory evidence in his possession would be incompatible with [the grand jury] system." *Id.* at ——, 112 S.Ct. at 1745. Accordingly, even accepting defendants' characterization of the evidence as substantially exculpatory, the relief sought must be denied. Furthermore, Papajohn's alternative request for inspection of the grand jury minutes is likewise denied since there is no evidence of misconduct. *See United States v. Torres,* 901 F.2d 205, 233 (2d Cir.) (noting that "[a] review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct") (citations omitted), *cert. denied sub nom., Cruz v. United States,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990).

### III. *Motions to Dismiss for Outrageous Government Conduct*

Defendants Brown, Leonard and Seyfert move to dismiss the indictment based on outrageous government conduct during the investigation and prosecution of this case. More particularly, Brown asserts that the government, and more pointedly Agent Cipriano, initiated a pattern of misconduct in 1979 which continued to the period covering the current indictment. Much of what is asserted in this regard appears to be founded on an "anti-Brown" animus allegedly displayed by Agent Cipriano. Leonard argues that the government's outrageous conduct involved an attempt to improperly target and induce him to commit the crime charged. Seyfert argues that the government's outrageous conduct occurred when the government disclosed to codefendants statements made by Seyfert pursuant to a proffer agreement.

■ "[T]o obtain dismissal of an indictment based upon a claim of outrageous government conduct, a defendant must establish that the government engaged in outrageous behavior in connection with the alleged criminal events and that due process considerations bar the government from prosecuting [him]." *United States v. Cuervelo,* 949 F.2d 559, 565 (2d Cir.1991) (citing *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973)) (further citation omitted). Furthermore, "the existence of a due process violation must turn on whether the government conduct, standing alone, is so offensive that it 'shocks the conscience,' . . . regardless of the extent to which it led the defendant to commit his crime." *United States v. Chin,* 934 F.2d 393, 398 (2d Cir.1991) (quoting *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952)).

■ In the Court's view, Leonard's allegations of outrageous conduct are most accurately described as potential underpinnings for an entrapment defense, to be presented to the finders of fact at trial. *See Cuervelo,* 949 F.2d at 565 (noting the "significant differences between a claim of entrapment and a claim of outrageous governmental conduct"). In making this determination, it is

significant that similar claims of outrageous government conduct have been rejected by the Second Circuit as falling far short of the type of conduct which would amount to a due process violation. *See e.g. United States v. Romano,* 706 F.2d 370, 372 (2d Cir.1983) (rejecting claim of outrageous government conduct where drug transaction initiated by government informant and government supplied the drugs); *United States v. Nunez–Rios,* 622 F.2d 1093, 1097–98 (2d Cir.1980) (rejecting claim of outrageous government conduct where defendant argued that informant's initiation of drug transaction and supplying narcotics violated due process). Accordingly, Leonard's motion to dismiss is denied.

■ Brown's motion to dismiss the indictment based on outrageous governmental conduct is likewise unavailing. Brown argues that the government's outrageous conduct has been displayed throughout "the investigation of this case from its initiation through [the CI] right through its presentation to the grand jury." Brown's Memo. in Supp. at 24. However, Brown fails to show a violation of his due process rights. First of all, Brown's contention that Agent Cipriano coerced him to make statements forms the basis for Brown's suppression motion, although even if accepted as true the allegations do not amount to conduct "so offensive that it 'shocks the conscience.' " *Chin,* 934 F.2d at 398.

■ Brown additionally alleges that the fact that a DEA agent in Arizona contacted him after he was indicted in this case further illustrates the government's misconduct. It is asserted that the Arizona agent sought Brown's cooperation in an unrelated investigation against Brown's former counsel. *See* Brown's Memo in Supp. at 21. However, the government points out that the prosecutor in the instant case, as well as the DEA agents in this case, had no knowledge of the telephone call made by the Arizona agent. Govt's Memo. in Opp. at 28. Moreover, it is conceded by all parties that Brown made no inculpatory statements during the conversation. Further still, the government will not seek to introduce any statements made by Brown during the conversation. *See Massi-*

*ah v. United States,* 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964). Accordingly, Brown's allegations of outrageous governmental conduct are insufficient to trigger a hearing; his motion to dismiss is denied.

■ Seyfert argues that the government acted outrageously when statements made by him to the government during a proffer session were disclosed to codefendants. Seyfert's Motion to Dismiss at 4. Specifically, Seyfert contends that a signed proffer agreement, and the concomitant meeting which took place, gave rise to an expectation on his part that the information would remain confidential and undisclosed. Obviously, Seyfert and the government never reached an agreement in any case.

Seyfert argues that the disclosure of the statements to codefendants was a "source of embarrassment." Aff. of Lee Ginsberg at ¶ 13. However, absent any real prejudice to Seyfert stemming from the disclosure, dismissal of the indictment is neither warranted nor authorized. *Bank of Nova Scotia v. United States,* 487 U.S. 250, 254–56, 108 S.Ct. 2369, 2373, 101 L.Ed.2d 228 (1988). Furthermore, the proffer agreement itself does not state that the statements made will be kept confidential, rather, it prohibits the government's use of any statements in its case-in-chief. *See* Govt's Memo. in Opp. at Exhibit f. Finally, the government's advance warning to Seyfert that the statements would be disclosed to codefendants, as well as the reasoning which underscored the government's disclosure, *see id.* at 30, demonstrate that the government's conduct fell far short of outrageous. *Chin,* 934 F.2d at 398; *Romano,* 706 F.2d at 372. Accordingly, defendants' motions to dismiss for outrageous governmental conduct are denied.

## IV. *Severance*

Defendants Brown, Papajohn and Seyfert each move for a severance of their trials from codefendants. More particularly, Brown moves for a severance based on the arguments that: (1) only at a separate trial will Leonard provide exculpatory evidence; (2) at trial the government will offer inculpatory

statements by co-defendants; (3) he will suffer prejudicial spillover at a joint trial; and (4) Leonard's proposed entrapment defense is irreconcilable with Brown's defense of non-involvement. Papajohn seeks a severance on the ground that Seyfert would offer exculpatory testimony at a separate trial. Seyfert argues that a severance is required due to the fact that the government will offer inculpatory statements by codefendants at trial. The Court addresses each defendant's application in turn.

## (A) Brown

The Court first turns to consider Brown's motion for a severance based on the argument that Leonard would offer exculpatory testimony at a separate trial. In two separate affidavits, Leonard asserts that at a separate trial he would be willing to testify that Brown did not participate in the charged conspiracy. Moreover, Leonard states that when approached about the narcotics deal, Brown indicated he was not interested, and opined that "the whole matter seemed like a government 'sting' operation." Although Leonard initially indicated that he would only testify at a trial subsequent to his own, Leonard thereafter withdrew that condition and asserted that he would testify for Brown at a severed trial, regardless of the order of trials.

 In considering Brown's application, the Court considers four factors, to wit: "(1) proof that [Leonard] would waive his Fifth Amendment privilege and testify at a severed trial; (2) whether exculpatory testimony would be cumulative; (3) the policy favoring judicial economy, and (4) whether it is likely that the offered testimony would be subject to effective impeachment." *United States v. Cardascia,* 951 F.2d 474, 485 (2d Cir.1991) (citing *United States v. Sliker,* 751 F.2d 477, 496 (2d Cir.1984)); *see also United States v. Finkelstein,* 526 F.2d 517, 523–24 (2d Cir. 1975), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976). In opposing Brown's motion, the government's primary argument is that Leonard's asserted unwill-

ingness to testify at a joint trial is at odds with a statement by his counsel that Leonard will testify at a joint trial. *See* Govt's Memo. in Opp. at 43. The government thus argues that Leonard's statement is called into "serious question" by these contradictory assertions. The government also contends that Leonard's purported exculpatory testimony will be subject to damaging impeachment through the use of Leonard's allegedly inculpatory post-arrest statements. On the other hand, Brown argues that Leonard's willingness to testify at a separate trial, irrespective of the order of trials, and the fact that Leonard's testimony will not be cumulative highlight the strength of the application.

The Court's application of the *Finkelstein* factors to Brown's request for a severance demonstrates that several conditions militate against a severance. First, Leonard fails in either affidavit to explicitly state that he would waive his Fifth Amendment privilege at a separate trial. *See Finkelstein,* 526 F.2d at 523. In addition, the third factor—judicial economy—falls squarely on the side of denying the application. As the government argues, separate trials of these defendants would involve a presentation of virtually identical evidence to separate juries, in contravention of the strong policy favoring joint proceedings. *See e.g., Richardson v. Marsh,* 481 U.S. 200, 209, 107 S.Ct. 1702, 1708, 95 L.Ed.2d 176 (1987). Moreover, it does appear that Leonard's anticipated exculpatory testimony would be subject to damaging impeachment in that such testimony is contradictory to post-arrest statements allegedly made by Leonard.

On the other hand, it does not appear that Leonard's testimony would be cumulative. Furthermore, despite the failure to waive his Fifth Amendment privilege, Leonard's willingness to testify at a severed trial—irrespective of the order of trials—represents a demonstration of the first *Finkelstein* factor which is more than frail.[3] However, in light of all the circumstances, the Court finds that the application is insufficient to warrant a severance at this point. However, Brown is

---

**3.** The Court notes that the fact that Leonard's counsel indicated in papers that Leonard *would* testify "at trial" detracts somewhat from the suf-

ficiency of this "showing." *Finkelstein,* 526 F.2d at 523.

not foreclosed from submitting another affidavit from Leonard which specifically addresses the waiver of the Fifth Amendment privilege and Leonard's unwillingness to testify at a joint trial. Should that occur, the Court will reconsider Brown's severance motion on this basis.

 Brown's argument that a severance is required based on anticipated antagonistic defenses is without merit. Brown asserts that Leonard's entrapment defense will be irreconcilable with his own defense of non-involvement. It is well established that "some antagonism between defendants' theories of defense does not require severance." *United States v. Carpentier,* 689 F.2d 21, 27–28 (2d Cir.1982), *cert. denied,* 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 957 (1983). Rather, a severance is required on such a basis only when " 'the jury, in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant.' " *Id.* at 28 (citation·omitted); *United States v. Serpoosh,* 919 F.2d 835 (2d Cir. 1990).

In this instance, the jury's acceptance of Leonard's defense of entrapment will not necessarily require a rejection of Brown's claim of non-involvement. It is not asserted that Leonard and Brown were both physically present at the time of arrest, which would present an arguably stronger factual basis for Brown's severance application. Furthermore, in *United States v. Tutino,* 883 F.2d 1125, 1130 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990), the court affirmed the denial of a severance motion based on antagonistic defenses where two defendants' reliance on entrapment and coercion defenses allegedly implicated the other two co-defendants. All four defendants were charged, *inter alia,* in a narcotics conspiracy, although the court found that the admission by the two defendants "did not necessitate a finding that either [codefendant] was the supplier or was otherwise involved." A similar circumstance is presented herein, and therefore Brown's motion to sever based on antagonistic defenses is denied.

 Brown moves for a severance on the additional ground that at trial the government will introduce post-arrest statements by Leonard and Seyfert which inculpate him. In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that a defendant is deprived of his rights under the Confrontation Clause when a non-testifying codefendant's confession naming him as a participant is admitted at a joint trial. However, the Court later circumscribed the *Bruton* rule by holding that the use of a codefendant's hearsay confession does not violate the confrontation clause where a proper limiting instruction is given and the confession is redacted to eliminate any reference to the defendant. *Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987). Moreover, the Second Circuit has repeatedly approved of the admission of "redacted confessions in which the names of co-defendants were replaced by neutral pronouns and 'where the statement standing alone does not otherwise connect co-defendants to crimes.' " *United States v. Williams,* 936 F.2d 698, 700 (2d Cir.1991) (quoting *United States v. Tutino,* 883 F.2d 1125, 1135 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990)); *see also United States v. Wilkinson,* 754 F.2d 1427, 1435 (2d Cir.), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985) ("[a] defendant's *Bruton* rights [are] violated ... only if the statement, standing alone, would clearly inculpate him without introduction of further independent evidence") (citation omitted).

Under the prevailing standard, Brown has not shown that any statement, appropriately redacted and admitted with a limiting instruction, would inculpate him on its face. Accordingly, the rule enunciated in *Bruton* does not require a severance herein.

 Brown's final argument for a severance is that a joint trial will result in prejudicial spillover, and therefore a severance is mandated pursuant to Rule 14 of the Federal Rules of Criminal Procedure. Rule 14 provides for relief from prejudicial joinder when a defendant is "prejudiced by a joinder of offenses or of defendants in an indictment." Fed.R.Crim.P. 14. Such a motion is " 'com-

mitted to the sound discretion of the trial judge.'" *United States v. Torres,* 901 F.2d 205, 230 (2d Cir.) (quoting *United States v. Casamento,* 887 F.2d 1141, 1149 (2d Cir.1989) *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990)), *cert. denied sub nom., Cruz v. United States,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990); *United States v. Cervone,* 907 F.2d 332, 341 (2d Cir.1990), *cert. denied,* 498 U.S. 1028, 111 S.Ct. 680, 112 L.Ed.2d 672 (1991). The heavy burden placed upon a defendant seeking severance on this basis requires that such defendant show that he would be so prejudiced by a joint trial that a fair trial would be denied him. *United States v. Rucker,* 586 F.2d 899, 902 (2d Cir.1978); *United States v. Persico,* 621 F.Supp. 842, 852 (S.D.N.Y.1985) (citations omitted).

■ In the case at bar, Brown's argument essentially rests on the premise that the evidence against his codefendants is stronger than any evidence against himself. However, " 'differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials.' " *United States v. Chang An–Lo,* 851 F.2d 547, 557 (2d Cir.) (citation omitted), *cert. denied,* 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988); *United States v. Panza,* 750 F.2d 1141, 1149 (2d Cir.1984). Moreover, the Court will instruct the jury to consider each defendant separately. *Chang An–Lo,* 851 F.2d at 556. In sum, having considered all of Brown's contentions in this regard, the Court finds that the alleged prejudicial spillover is insufficient to require a severance under Rule 14.

#### (B) Seyfert

■ Seyfert seeks a severance on the ground that introduction at trial of statements by non-testifying co-defendants will implicate him. More particularly, Seyfert's *Bruton* argument extends to the contention that redaction of his name will be insufficient to protect his interest "given the context of

the case." However, as discussed above, in determining whether a given statement connects codefendants to crimes, courts must view the redacted confession "in isolation from the other evidence introduced at trial." *United States v. Williams,* 936 F.2d 698, 700 (2d Cir.1991). Appropriately redacted, if the confession does not incriminate the defendant, "then it may be admitted with a proper limiting instruction even though other evidence in the case indicates that the neutral pronoun is in fact a reference to the defendant." *Id.* Furthermore, Seyfert's claim that his defense is antagonistic to that of Brown does not warrant a severance. Even if, as Seyfert fears, Leonard and Brown testify that Seyfert was culpable, "[t]he mere fact that co-defendants seek to place the blame on each other is not the sort of antagonism that requires a severance." *United States v. Villegas,* 899 F.2d 1324, 1346 (2d Cir.), *cert. denied,* 498 U.S. 991, 111 S.Ct. 535, 112 L.Ed.2d 545 (1990) (citation omitted); *see also United States v. Casamento,* 887 F.2d 1141, 1154 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). Therefore, Seyfert's motion for a severance is denied.[4]

#### (C) Papajohn

■ Papajohn moves for a severance based on the assertion that Seyfert, and possibly Leonard, would offer exculpatory testimony at a severed trial. As discussed above, the factors to be considered in determining such a motion were outlined in *Finkelstein,* 526 F.2d at 523–24. In the Court's view, Papajohn's motion may be quickly disposed of given the absence of an affidavit—by either co-defendant—which attests to their willingness to testify at a severed proceeding. More pointedly, counsel for Seyfert has indicated by affidavit that his client has *not* agreed to testify at a severed trial. Aff. of Lee Ginsberg, Esq. at ¶ 26. Accordingly, Papajohn's motion for a severance is denied.

---

4. To the extent that Seyfert seeks a severance from Papajohn, *see* Aff. of Lee Ginsberg, dated Oct. 29, 1992 at ¶ 7, the motion is without merit. First of all, the government indicates that it will not seek to introduce Papajohn's post-arrest statement in its case-in-chief. *See* Letter of A.U.S.A. Eric Corngold, dated Nov. 20, 1992 at 2. Furthermore, redaction of the statement under the controlling analysis will satisfy the *Bruton* concerns even if the statement is offered. *See Williams,* 936 F.2d at 700.

## V. *Discovery and Bills of Particulars*

All defendants move for various forms of discovery. The Court addresses each of these requests below.

### (A) Bill of Particulars

Brown and Papajohn each demand bills of particulars pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure. In large measure defendants seek specificity of the dates and places of acts undertaken in furtherance of the charged conspiracy, as well as the times defendants joined—or withdrew from—the conspiracy.

 It is well established that the decision to grant or deny a bill of particulars is within the Court's discretion. *United States v. Panza,* 750 F.2d 1141, 1148 (2d Cir.1984); *United States v. Feola,* 651 F.Supp. 1068, 1132 (S.D.N.Y.1987), *aff'd,* 875 F.2d 857 (2d Cir.), *cert. denied,* 493 U.S. 834, 110 S.Ct. 110, 107 L.Ed.2d 72 (1989). The purpose of a bill of particulars is " 'to provide defendant with information about the details of the charge against him if this is necessary to the preparation of his defense, and to avoid prejudicial surprise at trial,' " *United States v. Torres,* 901 F.2d 205, 234 (2d Cir. (citation omitted)), *cert. denied sub nom., Cruz v. United States,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990), as well as to enable a defendant to plead double jeopardy if subsequently prosecuted for the same offense. *United States v. Bortnovsky,* 820 F.2d 572, 574 (2d Cir.1987) (citations omitted). Generally, " '[a] bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.' " *Torres,* 901 F.2d at 234 (citations omitted). In that connection, it is to be noted that a bill of particulars is not intended to be used as a discovery device. *See generally United States v. Weinberg,* 656 F.Supp. 1020, 1027 (E.D.N.Y.1987).

 In light of these principles, the motions for bills of particulars are denied. Defendants already have received substantial information regarding the charge against them by virtue of the complaint, the post-arrest statements of each defendant, and tapes of recorded conversations. Moreover, in light of the extensive motions filed by defendants, the government has set forth in some detail its version of the factual backdrop of this case. Thus, to a great extent the information sought has been provided in other ways. *See Bortnovsky,* 820 F.2d at 574. Moreover, defendants are not necessarily entitled to detailed evidence about the conspiracy charged in order to prepare for trial. *Feola,* 651 F.Supp. at 1132. Specifically, it is not required that a defendant receive, prior to trial, details regarding the date and manner in which a conspiracy was formed, or when each defendant entered into the conspiracy. *United States v. Persico,* 621 F.Supp. 842, 868 (S.D.N.Y.) (citations omitted), *aff'd on other grounds,* 774 F.2d 30 (2d Cir.1985). Accordingly, in light of these circumstances, defendants' motions for bills of particulars are denied.

### (B) Discovery

Defendants move for the production of various documents and items pursuant to Rule 16 of the Federal Rules of Criminal Procedure. The Court addresses each request below.

#### (i) *Witness List*

 Brown and Papajohn seek a list of all government witnesses. *See* Brown Notice of Motion at p. 29; Papajohn Motion at 1. In *United States v. Bejasa,* the court noted that a district court's denial of a motion to compel a government witness list is not an abuse of discretion in the absence of " 'a *specific* showing that disclosure [is] both material to the preparation of [the] defense and reasonable in light of the circumstances....' " 904 F.2d 137, 139–40 (2d Cir.) (citations omitted), *cert. denied,* 498 U.S. 921, 111 S.Ct. 299, 112 L.Ed.2d 252 (1990). With respect to the motions at bar, neither defendant has made such a showing. Moreover, this Court does not see a compelling need for the production of such a list at this time. Therefore, the request is denied.

#### (ii) *Confidential Informant*

 Defendants seek the names and addresses of "any informants ... utilized in the

investigation and preparation of the instant case." Papajohn Motion at 6; Brown Memo. in Supp. at 72. As noted above, a district court may direct disclosure of a confidential informant's identity where the moving defendant makes "'a *specific* showing that disclosure [is] both material to the preparation of [the] defense and reasonable in light of the circumstances surrounding [the] case.'" *Bejasa,* 904 F.2d at 140 (quoting *United States v. Cannone,* 528 F.2d 296, 301 (2d Cir.1975) (emphasis in original)); *United States v. Zuluaga,* 651 F.Supp. 746, 752 (E.D.N.Y.1986) (noting that "[t]he burden of establishing the need for disclosure rests with the defendant, who must show that in the absence of such disclosure, he will be denied a fair trial") (citation omitted).

■ In the case at bar, defendants fail to make such a specific showing. Furthermore, the government has indicated that the confidential informant will testify at trial, and that defendants will have access to all impeachment material regarding this witness in advance of trial. *See DiBlasio v. Keane,* 932 F.2d 1038, 1043 (2d Cir.1991) (noting that "if the government chooses and is able, it may physically produce the informant for testimony; in which case, depending on circumstances at trial, the trial judge may conclude that disclosure of his true identity or where he resides is not necessary"). Based on the government's intention to call the informant at trial, disclosure of the confidential informant's identity is not warranted. Therefore, defendants' motion is denied.

### (iii) *Personnel Files*

■ Brown moves for the disclosure of Agent Cipriano's personnel file. It is asserted that the government's case against Brown centers on the statements attributed to Brown by Agent Cipriano. Brown argues that Agent Cipriano's credibility therefore takes on "overwhelming significance," and that material pertaining to this issue may be discovered in Agent Cipriano's personnel file. The government argues that, although mindful of its obligation to disclose evidence which may be material to the determination of guilt or innocence under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963),

there is no prosecutorial obligation to investigate every possible source of such evidence within the possession of the government.

Although the Court agrees with the government to the extent that there is no binding authority in this circuit requiring the government, upon a defendant's application, to undertake a particular method of determining the existence of *Brady* material, Brown's application is somewhat unique. In addition, the government does not dispute that much of its evidence against Brown turns on the credibility of Agent Cipriano.

In *United States v. Kiszewski,* 877 F.2d 210 (2d Cir.1989), the defendant sought production of personnel files for two FBI agents who were to testify at trial. After reviewing the files, the prosecutor reported to the trial court that the files contained no *Brady* material; the court then refused to compel either *in camera* review or disclosure to the defense. *Id.* at 215. Relying, in part, on the fact that credibility was the central issue and that the evidence presented at trial consisted of opposing stories by the defendant and government agents, the Second Circuit assigned error to the district court's refusal to compel *in camera* inspection based solely on the government's representations. *Id.* at 216. In the case at bar, the government points out that, because the prosecutor reviewed the files of the agents before the issue was presented to the trial court, the *Kiszewski* court was not required to reach the issue of whether the defendants could actually compel such a review. Moreover, the motion at bar could arguably be denied based on Brown's failure to offer some evidence suggesting that the personnel file actually contains *Brady* material.

However, like the circumstances presented in *Kiszewski,* much of the case against Brown turns on the credibility of a federal agent. Specifically, it is Agent Cipriano who wrote the report detailing Brown's alleged confession during the meeting of October 23, 1991. In addition, it is asserted that Agent Cipriano has a particular reason to ensure that Brown is convicted, based on a personal animosity. Accordingly, in light of the somewhat unique posture of this case vis à vis the relationship between Brown and Agent Cipri-

ano, the Court grants Brown's motion to the extent that the government shall submit Agent Cipriano's personnel file to the Court for *in camera* inspection. The file shall be submitted to Chambers by January 4, 1993, in order to allow for inspection prior to Brown's pre-trial hearing. Since the application is granted based on a unique circumstance regarding Agent Cipriano, the application is denied insofar as it seeks production of personnel files for any other agents.

### (iv) *Brady and Jencks Act Material*

■ Brown and Papajohn move for the production of exculpatory material, although as the government points out, much of the discovery sought consists of impeachment material relating to potential government witnesses. The government indicates that it will disclose impeachment and Jencks Act material one week in advance of the witnesses' testimony. Such a time frame represents an approach that is fully consistent with the law. *See* 18 U.S.C. § 3500(a); *United States v. Zuluaga*, 651 F.Supp. 746, 751 (E.D.N.Y. 1986); *United States v. Dellacroce*, 625 F.Supp. 1387, 1398–99 (E.D.N.Y.1986). Moreover, defendants have not advanced any compelling need for early disclosure of such material. Given the government's representations, the Court is satisfied that the obligations placed on the prosecution by *Brady* will not be neglected, although it is nevertheless hereby directed that they be fulfilled. However, the motions seeking early disclosure of impeachment material are denied at this time.

### (v) *Other Discovery*

■ To the extent that defendants seek discovery of items seized at the time of their arrests and related matters, the government asserts that all such items have been available for inspection by defendants for nearly one year. In addition, Papajohn moves for the preservation of all original tape recordings and handwritten notes by law enforcement agents. The government indicates that all original tape recordings have been preserved. With respect to the handwritten notes, the government persuasively argues that there is no obligation to preserve origi-

nal handwritten notes prepared by agents where those notes have been formalized into reports. *See United States v. Elusma*, 849 F.2d 76, 79 (2d Cir.1988), *cert. denied*, 489 U.S. 1097, 109 S.Ct. 1570, 103 L.Ed.2d 936 (1989). Accordingly, that aspect of Papajohn's application is denied. In addition, Papajohn's motion for disclosure of "similar acts" is moot inasmuch as defendants already have received copies of their criminal history records pursuant to Rule 16(a)(1)(B) of the Federal Rules of Criminal Procedure. Finally, any requests for discovery not specifically addressed above are denied.

## VI. *Evidence of Prior Convictions*

Leonard and Papajohn move *in limine* to preclude the government from introducing evidence of their prior convictions for narcotics crimes. Papajohn argues that this Court is required to exclude evidence of prior convictions which do not involve dishonesty or false statements where the prejudicial effect outweighs the probative value, under Rule 609 of the Federal Rules of Evidence. On the other hand, the government argues that such evidence is admissible under Rule 404(b) of the Federal Rules of Evidence.

The government has informed defendants that it "may seek to introduce evidence concerning the activities that led to [defendants'] prior narcotics arrests." Govt's Memo. in Opp. at 66. Thus, defendants have been provided with notice far in advance of trial. *See* Fed.R.Evid. 404(b). In addition, the government contends that such evidence will be admissible depending on the defenses offered at trial.

Federal Rule of Evidence 404(b) provides that prior act evidence "is not admissible to prove the character of a person in order to show action in conformity therewith," but may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." This circuit's "inclusionary approach" allows the admission of such evidence " 'for any purpose other than to show a defendant's criminal propensity.' " *United States v. Roldan–Zapata*, 916 F.2d 795, 804 (2d Cir.1990) (quoting *United States v. Harris*, 733 F.2d 994, 1006 (2d Cir.1984)),

*cert. denied,* —— U.S. ——, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991).

■■■■ The general test for the admission of prior acts evidence was outlined in *Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). The factors comprising that test are: (1) the evidence must be introduced for a proper purpose pursuant to Rule 404(b); (2) the evidence must be relevant to an issue in the case; (3) the evidence must satisfy the probative-prejudice balancing test of Rule 403; and (4) a limiting instruction must accompany the admission of the evidence. *Id.* at 691–92, 108 S.Ct. at 1502; *see also United States v. Gilan,* 967 F.2d 776, 780 (2d Cir.1992). It is to be noted that evidence offered pursuant to Rule 404(b) will not pass the relevance prong of the *Huddleston* test unless a jury could reasonably conclude, by a preponderance of the evidence, that " 'the act occurred and that the defendant was the actor.' " *Gilan,* 967 F.2d at 780 (citation omitted).

■■■■ In the case at bar, it is not entirely clear from the papers what defenses Papajohn and Leonard will pursue at trial. Nor is the Court fully familiar with the circumstances of the prior acts which the government may seek to introduce at trial. Thus, defendants' *in limine* motions to preclude such evidence are deferred at this time. However, the Court notes that where a defendant's intent and knowledge are put in issue, evidence of involvement in narcotics activity other than that charged is often appropriate under Rule 404(b). *See e.g. United States v. Ciro,* 753 F.2d 248, 250 (2d Cir.), *cert. denied,* 471 U.S. 1018, 105 S.Ct. 2025, 85 L.Ed.2d 306 (1985); *United States v. Martino,* 759 F.2d 998, 1005–05 (2d Cir.1985). Furthermore, the Second Circuit has ruled that an assertion of "mere presence" at the scene of a charged narcotics offense is sufficient to place intent in issue, thereby enabling the government to prove intent through the admission of Rule 404(b) evidence. *United States v. Bruno,* 873 F.2d 555, 561–62 (2d Cir.), *cert. denied,* 493 U.S. 840, 110 S.Ct. 125, 107 L.Ed.2d 86 (1989).

Although the Court, by this opinion, does not hold that the government's evidence of prior acts is necessarily admissible, the authority cited above is discussed nevertheless in light of the defenses which, based on defendants' papers, may be raised at trial. In any event, defendants' motions to preclude are deferred at this time; the Court will entertain oral argument on these issues prior to the commencement of trial.

### VII. Enforcement of Leonard's Plea Agreement

Leonard moves to enforce a plea agreement which he signed in October of 1991. That agreement indicated, *inter alia:* that Leonard would plead guilty to the charge in the current indictment; that Leonard would cooperate fully with the United States Attorney's Office; that Leonard would not reveal his cooperation to any third party; and that Leonard must give "complete, truthful and accurate information and testimony...." *See* Leonard Motion at exhibit A. Leonard essentially argues that, although initially his cooperation apparently was satisfactory, the government thereafter rejected Leonard's cooperation, purportedly because Leonard's subsequent statements exculpated Brown. Leonard contends that this was the basis for the government's warning that it does not intend to make a substantial assistance motion for Leonard based on section 5K1.1 of the United States Sentencing Guidelines. On the other hand, the government argues that Leonard breached the plea agreement by providing false information and revealing his cooperation to co-defendants. It is to be noted that the charge contained in the indictment against Leonard is the same charge contained in the plea agreement at issue.

■■■■ The issues raised by Leonard's motion are properly analyzed in the context of contract principles, and therefore specific performance may be an appropriate remedy for a prosecutor's breach of a plea agreement. *United States v. Knights,* 968 F.2d 1483, 1486 (2d Cir.1992) (citing *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971)). Where a plea agreement includes a cooperation clause, and the government's performance "is conditioned on its satisfaction with the defendant's efforts ... this condition is not met 'if the obligor is

honestly, even though unreasonably, dissatisfied.' " *Id.* (quoting *United States v. Rexach,* 896 F.2d 710, 713 (2d Cir.), *cert. denied,* 498 U.S. 969, 111 S.Ct. 433, 112 L.Ed.2d 417 (1990)) (further citation omitted).

 In the case at bar, Leonard does not dispute the government's assertion that he breached the plea agreement by revealing his cooperation to his codefendants. Furthermore, the government has submitted Leonard's various post-arrest statements to show that he has changed his version of Brown's participation in the charged offense. *See* Govt's Memo. in Opp. at exhibits A, B and C. It must be emphasized that the prosecutor's evaluation of a defendant's cooperation—and the decision whether to make a substantial assistance motion—is subject to a limited review. *Id.* at 1487. Thus, in light of the circumstances, it does not appear that the government's decision not to make a motion of substantial assistance is based on any "impermissible consideration[ ] such as race or religion." *Id.*

In any event, the Court agrees with the government's characterization of Leonard's motion as premature. Because Leonard's plea agreement contained the same charge as the one count indictment, the only open question, should Leonard plead guilty pursuant to the agreement, is the government's obligation to make a motion of substantial assistance. Therefore, Leonard is not precluded from going to trial and, if convicted, moving for a hearing to address the government's alleged bad faith in failing to make such a motion prior to the imposition of sentence. *See Knights,* 968 F.2d at 1487. Should that come to pass, the Court will follow the procedure clearly outlined in *Knights. See id.* However, at this time, Leonard's motion to enforce his plea agreement is denied for the reasons stated above.

## VIII. *Dismissal or Discontinuance as Against Seyfert*

Seyfert moves for a dismissal of the indictment against him, or in the alternative for an indefinite continuance, based on the fact that he suffers from Human Immunodeficiency Virus ("HIV"), a precursor to AIDS. Although Seyfert concedes that he is mentally competent to stand trial, it is asserted that his fragile physical health would be compromised by the rigors of a trial. The government argues that the Court's authority to grant the motion is in doubt, and that even assuming such authority, the trial should proceed. Seyfert, by way of reply, indicates that he is at greater risk since he is now classified as having full-blown AIDS.

 Even assuming that this Court has the authority to grant an application such as Seyfert's the current motion is denied. Although the letter from Seyfert's physician states that an "extremely stressful situation such as a trial" would have an adverse impact on defendant's fragile heath, *see* Seyfert Motion at exhibit C, other factors militate strongly against dismissal or continuance. Applying the factors urged by Seyfert, it is not asserted that Seyfert will be hampered from preparing or presenting his defense at trial. *See e.g., United States v. Landsman,* 366 F.Supp. 1027, 1028 (S.D.N.Y.1973). Furthermore, the fact that Seyfert's disease is both fatal and incurable would tend to support a speedier resolution, since any significant delay may amount to a dismissal. *See United States v. Doran,* 328 F.Supp. 1261, 1263 (S.D.N.Y.1971). Finally, the seriousness of the crime charged against Seyfert is a factor which similarly militates against dismissal of the indictment. *Id.* Accordingly, the motion is denied.

To the extent that Seyfert argues that a term of incarceration would prevent him from receiving necessary medical treatment, the Court will certainly entertain any motion made in that connection if and when a sentence is imposed. However, for the reasons stated above, dismissal—or a continuance—is not warranted at this time.

## CONCLUSION

For the reasons stated above, a decision on Brown's motion to suppress is deferred pending a hearing; the subpoena duces tecum issued by Brown in anticipation of such a hearing is quashed. Defendants' motions to dismiss the indictment for alleged grand jury improprieties are denied, as are the motions to dismiss for outrageous government con-

**306**

duct. Each of defendants' motions for severance are denied at this time. In addition, as indicated above the motions for bills of particulars and discovery are denied except to the extent that the government shall submit Agent Cipriano's personnel file to the Court for *in camera* inspection. Furthermore, the motions for early disclosure of *Brady* and Jencks Act materials are denied; defendants' motions to preclude the admission of evidence relating to prior acts are deferred. Finally, Leonard's motion to enforce a plea agreement and Seyfert's motion to dismiss or continue indefinitely are likewise denied.

SO ORDERED.