**UNITED STATES of America, Appellee,**

v.

**Mario BEJASA, Jr.,
Defendant–Appellant.**

**No. 1221, Docket 90–1014.**

United States Court of Appeals,
Second Circuit.

Argued May 11, 1990.

Decided May 23, 1990.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. (Nancy Northup, Kerri Martin Bartlett, Asst. U.S. Attys., of counsel), for appellee.

Miller, Cassidy, Larroca & Lewin, Washington, D.C. (Nathan Lewin, Deborah Bradley Clements, of counsel), for defendant-appellant Mario Bejasa, Jr.

Before ALTIMARI and MAHONEY, Circuit Judges, and POLLACK, Senior District Judge.*

MILTON POLLACK, Senior District Judge.

Defendant-appellant Mario Bejasa, Jr., appeals from a judgment of conviction entered in the Southern District of New York (Metzner, J.) on December 18, 1989. Bejasa was convicted by a jury following a four-day trial on five counts of conspiring to defraud the United States and the United States Department of Justice, Immigration and Naturalization Service ("INS"), to file false statements with the INS, and to obstruct INS proceedings, in violation of 18 U.S.C. § 371; of knowingly preparing and filing false forms with the INS, in violation of 18 U.S.C. §§ 2, 1001; and of knowingly obstructing INS proceedings, in violation of 18 U.S.C. §§ 2, 1505. Subsequent to the conviction, the Court suspended imposition of sentence on all five counts and placed Bejasa on concurrent three-year terms of probation, with the special condition that he perform 100 hours of community service. In addition, the Court assessed a $10,000 fine. Bejasa is currently serving his term of probation.

Bejasa contends on appeal that he did not receive a fair trial on the grounds that the Government blocked access to witnesses and failed to produce certain exculpatory impeachment material and on the ground that the trial judge allegedly improperly swayed the jury against defendant by his so-called *sua sponte* interruptions.

### Background

Bejasa is a Filipino lawyer who came to New York in 1980 and who, according to his testimony, was admitted to practice law in New York in February 1983. In April 1983, Bejasa was hired by Godwin Valdez for his law office, where Bejasa was subsequently paid $200–$300 per week.

Valdez was arrested in 1988 for entering the United States with a fraudulent American passport. As part of his subsequent cooperation with the Government, Valdez implicated Bejasa, Arnold Clemente (as a co-conspirator) and others in a scheme to defraud the United States and the INS by obtaining "sham" divorces and marriages for Filipinos in the United States who sought permanent resident alien status (a "green card"). Indictment S 88 Cr. 967 was filed on August 31, 1989, charging Bejasa with five counts, including conspiracy to defraud the United States and INS, knowingly preparing false INS forms, and knowingly obstructing INS proceedings.[1]

At trial, the Government presented evidence regarding two main transactions:

In November 1983, Anthony Paredes entered the United States on a one-month visitor's visa with his wife. He subsequently contacted Clemente about changing his immigration status. Clemente informed Paredes about a sham divorce/marriage procedure and for $5,000 agreed to arrange a new marriage to a pliant Ameri-

---

* Honorable Milton Pollack, Senior United States District Judge for the Southern District of New York, sitting by designation.

1. That indictment superseded Indictment 88 Cr. 967, which was filed on December 21, 1988. Arnold Clemente pleaded guilty to Count One of Indictment 88 Cr. 967 on April 18, 1989, before the Honorable Pierre N. Leval, United States District Judge. On August 1, 1989, Judge Leval suspended execution of the one-year sentence he had imposed on Clemente and placed Clemente on probation for four years, with the special condition that he perform 400 hours of community service. Judge Leval also imposed a $500 fine. After signing the cooperation agreement with the Government, Godwin Valdez pleaded guilty to Count One of Indictment 88 Cr. 967 on January 6, 1989, before Judge Leval. On December 1, 1989, Judge Leval suspended the sentence he had imposed and placed Valdez on probation for two years.

can citizen. He then accompanied Paredes to Valdez' law firm where Paredes met with Valdez. Valdez testified that during this meeting he called Bejasa in, told him about the scheme and told him that he wanted Bejasa to handle the legal work for Paredes. Valdez subsequently prepared the papers for a divorce of Paredes from his wife, Lourdes Paredes, with falsified addresses and grounds for divorce. On March 19, 1984, Bejasa prepared and notarized a supplemental affidavit for the divorce action which contained false statements. After Paredes was married to his American "wife," Christina Chaj, the evidence indicates that he continued to live with his ex-wife Lourdes Paredes; yet Bejasa signed immigration forms which contained false information about Paredes' status. On June 4, 1984, according to Paredes' testimony, Bejasa coached Paredes and Chaj on false answers for an INS interview.

In April 1984, Daniel Dayao entered the United States on a six-month tourist visa with his wife. Dayao learned from Paredes of the divorce scheme, and, through Paredes, met Clemente, who said that for $5,000 he would find Dayao an American wife and a law firm to handle the legal work. In May or June 1984, according to the testimony adduced at trial, Dayao told Bejasa he wanted a divorce to obtain a green card but that he would continue to live with his Filipino wife. According to the testimony, Bejasa agreed to and did prepare his divorce papers, which contained false information. Dayao subsequently married Linda Shugart. On November 15, 1984, Bejasa presented to Dayao immigration papers which had false information for his signature. Dayao, however, never went through with his INS interview and was never granted resident alien status.

Neither Paredes nor Dayao ever left his former wife. After the INS charade, Paredes divorced his American "wife" and resumed his interrupted marriage with his former wife, and Dayao, at the time of trial, was engaged in the process of reversing his status similarly.

*Discussion*

In asserting on this appeal that he was not accorded a fair trial, Bejasa makes three primary contentions: (1) that the Government denied him access to the main Government witnesses in the case; (2) that the Government failed to produce certain exculpatory impeachment material for Bejasa's use at trial; and (3) that the trial judge improperly swayed the jury against Bejasa by his comments and questioning during the trial. We will address each contention in turn.

*I. Access to Government Witnesses*

■ Prior to trial, Bejasa through his counsel, Jonathan Avirom, sought to interview Paredes and Dayao, two of the Government's primary witnesses against Bejasa. The Government's representatives refused to provide the defense with their phone numbers or addresses. Though Bejasa never sought a court order to mandate production of this information, at the last pretrial conference, one month before the trial, the Government agreed to ask the two witnesses if they wished to speak to defense counsel. The Government's representative stated on the record that he contacted the witnesses "more than once." However, Paredes and Dayao chose not to be interviewed by the defense.

Bejasa argues that because of the vital nature of Paredes and Dayao's testimony he could not properly prepare his defense, including the cross-examinations of those witnesses, without being able to interview them.

Although the Government has no "special right or privilege to control access to trial witnesses," *United States v. Hyatt*, 565 F.2d 229, 232 (2d Cir.1977), the Government did not improperly interfere with access here. Fed.R.Crim.P. 16 does not require the Government to furnish the names and addresses of its witnesses in general. It is true that the "district courts have authority to compel pretrial disclosure of the *identity* of government witnesses ..." *United States v. Cannone*, 528 F.2d 296, 300 (2d Cir.1975) (emphasis added). However, in the absence of "a *specific* showing

that disclosure was both material to the preparation of [the] defense and reasonable in light of the circumstances surrounding [the] case," *id.* at 301 (emphasis in original), the district court could not be said to have abused its discretion in not compelling such disclosure.

This, however, is not a case in which the Government was withholding the identities of or access to witnesses whose presence at trial would surprise the defendant. Here, Bejasa knew who the witnesses would be, had dealt with them before, and, presumably, either already knew their addresses and phone numbers from his representation of them or could otherwise have contacted them had he attempted with due diligence to do so. Morever, no *"specific* showing" of any sort has been made here that disclosure of more than the identities of the witnesses was material to the preparation of the defense; nor did Bejasa ever even seek an order from the Court to compel such disclosure. Rather he agreed to have the Government contact Paredes and Dayao for him, which it apparently did. Finally, it should be noted that Bejasa's cross-examinations of Paredes and Dayao at the trial were both vigorous and extensive.

## II. Disclosure of Impeachment Material

■ At the inception of trial, Bejasa's counsel noted on the record that Bejasa had not received the file that the INS created on Valdez when he came to Miami using a phony United States passport, a crime to which he has pled guilty and for which he has been sentenced. The defense felt that this file contained information which would impeach the Government's primary witness, Valdez, and was therefore exculpatory. The Government initially indicated that no such file existed with INS in Florida because the case had been handled by the United States Customs Service ("Customs"). The next day, the Court ordered the Government to produce the file whether Customs or INS had it, but cautioned, "I think there are going to be limits to it. I can't tell you until I have the file and go over it." That afternoon the Government informed the Court that the file, which was in the possession of the

INS, was being air delivered from Florida, but handed over Valdez' sworn post-arrest statement which had previously arrived from the Miami file. The rest of the file did not arrive until after Valdez had testified. At that time, the Court, having itself examined the file, denied Bejasa's request to put Valdez back on the stand for further cross-examination, finding that the information in the file did not add materially to the previous cross-examination.

The Government admits that this file contained exculpatory impeachment evidence which should have been produced pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). However, failure to produce *Brady* material, when inadvertent as here, does not automatically require reversal. To reverse, the evidence must be "material in the sense that its suppression undermines confidence in the outcome of the trial," *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985), *i.e.,* it is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682, 105 S.Ct. at 3383.

The Government contends, correctly, that there is no reasonable probability that this evidence would have changed the result, because Bejasa had already cross-examined Valdez extensively on the areas contained in the file, namely: his cooperation with the Government; his 1989 conviction for entering the United States using a false United States passport; his 1984 entry using a false Philippine passport, for which he was never arrested; the fraudulent marriages he helped arrange; and his attempt to defraud an insurance company by falsely claiming to have lost some $2,000 in traveller's checks. While the Government unquestionably should have produced the evidence in the Miami file prior to Valdez' testimony, as found by the trial judge, it would have had little or no influence on the result. Therefore, it is not material evidence under the standard announced in

*Bagley,* and the Government's inadvertent failure to produce it before Valdez' testimony does not constitute a basis for reversing Bejasa's conviction.

### III. Trial Judge's Conduct:

■ "Rarely is there a case reaching us after conviction in which the defendant believes he has received a fair trial. The human tendency to blame a trial judge for the jury's verdict of guilt is a frailty we often encounter, and almost as frequently we find such claims to be without merit or substance. Once again we are asked by a convicted defendant to consider a claim of improper conduct on the part of a trial judge." *United States v. Nazzaro,* 472 F.2d 302, 303 (2d Cir.1973) (reversing conviction of defendant).

Defendant-appellant cites several examples in which Judge Metzner interrupted testimony of Valdez, Paredes and Dayao either to prevent a question which had not been objected to by the Government or to interpret an answer on behalf of a witness. Bejasa contends that, in a case which allegedly hinged almost solely on Bejasa's credibility as opposed to that of Valdez, Paredes and Dayao, the Court manifested its endorsement of the prosecution's case and improperly swayed the jury against Bejasa. The defendant has far from met the substantial burden of showing reversible error.

Both the Federal Rules of Evidence and the relevant case law make clear that the trial judge may actively participate in a jury trial. He "need not sit like a 'bump on a log' throughout the trial." *United States v. Pisani,* 773 F.2d 397, 403 (2d Cir.1985), *reh'g denied,* 787 F.2d 71 (1986). Moreover, the district court has "broad discretion over the scope of cross-examination, and we will not overturn an exercise of that discretion absent a clear showing of abuse." *United States v. Bari,* 750 F.2d 1169, 1178 (2d Cir.1984) (citations omitted), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482,

87 L.Ed.2d 617 (1985). This Court will reverse when "it appears clear to the jury that the court believes the accused is guilty." *Nazzaro,* 472 F.2d at 303. The vital question is not whether the trial judge's conduct left something to be desired but "whether his behavior was so prejudicial that it denied ... appellant[ ] a fair, as distinguished from a perfect, trial." *United States v. Robinson,* 635 F.2d 981, 984 (2d Cir.1980), *cert. denied,* 451 U.S. 992, 101 S.Ct. 2333, 68 L.Ed.2d 852 (1981). In making this determination, we "can only be guided by the cold black and white of the printed record." *United States v. Mazzilli,* 848 F.2d 384, 389 (2d Cir.1988).

Judges, being human, are not immune to feelings of frustration at the occasional antics or inartfulness of attorneys or impatience at the evasiveness of witnesses. Such feelings may give vent to remarks which, judged in isolation from the totality of the record through the dispassionate looking glass of hindsight, "would better have been left unsaid." *Robinson,* 635 F.2d at 985. Yet, analysis of such comments, taken out of context of the entire record, is not the proper basis for review. Rather, we must make "an examination of the entire record," *Mazzilli,* 848 F.2d at 389, in order to determine whether the defendant received a fair trial.

■ Having carefully scrutinized the entire trial record here, we are convinced beyond peradventure of doubt that Judge Metzner's conduct was not prejudicial to defendant and that Bejasa's trial was fair. Judge Metzner's inquiries and interpolations complained of assisted in clarification of ambiguities for the benefit of the jury. *Cf. United States v. Gurary,* 860 F.2d 521, 527 (2d Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1931, 104 L.Ed.2d 403 (1989). Moreover, any possible prejudicial effect was cured by Judge Metzner's cautionary instruction.[2]

---

**2.** Judge Metzner charged:
I have sought to avoid any comments which might suggest that I have personal views on the evidence or that I have any opinion as to the guilt or innocence of this defendant. You are not to assume that I have any such feel-

ings or opinions. This charge is given to you solely to instruct you as to the applicable law in this case.
The actions of the judge during the trial in granting or denying motions or ruling on objections by counsel or in statements to coun-

In sum, none of the defendant-appellant's contentions regarding an unfair trial have merit. Accordingly, we affirm the judgment of conviction entered against Bejasa.

Affirmed.

sel or in attempting to clearly set forth the law in these instructions are not to be taken by you as any indication of any determination of the issues of fact. These matters, the ac- tions of the court, relate to procedure and law. You, the members of the jury, determine the facts. Tr. 494.