**UNITED STATES of America,**

v.

**Michael T. GASPARIK and Roger L. Fidler, Defendants.**

**No. 00 CR 0650 SAS.**

United States District Court, S.D. New York.

March 8, 2001.

---

Patrick Smith, United States Attorney's Office, Southern District of New York, New York City, for the United States of America.

Robert M. Simels, Robert M. Simels, P.C., New York City, for Michael Gasparik.

Eliot F. Bloom, Law Offices of Eliot Bloom, Mineola, NY, for Roger Fidler.

## *OPINION AND ORDER*

SCHEINDLIN, District Judge.

On March 2, 2001, on the fifth day of trial, the Government moved for a declaration that the testimony of Jay J. Hait—an attorney who had represented defendant Michael T. Gasparik in his capacity as an associate of co-defendant Roger L. Fidler, also an attorney—is not precluded by the attorney-client privilege.[1] Defendants object to the admission of Hait's testimony on several grounds. For the reasons discussed below, Hait may not testify in the

---

1. The Government first alerted the Court to its desire to call Hait as a witness on March 1, 2001. *See* Tr. at 395.

Government's direct case. The Government may call Hait as a rebuttal witness, should that be warranted by the defense case, subject to the limitations set forth in this Opinion.

## I. BACKGROUND

The trial in this securities fraud prosecution commenced with jury selection on February 26, 2001. Several days prior to jury selection, the Government submitted its witness list to the Court for the purpose of jury voir dire. On the morning of jury selection, the Government submitted an additional list of witnesses, which was also included in the voir dire. The name Jay J. Hait was not on either list submitted by the Government.

Immediately following jury selection counsel made opening statements. Gasparik's counsel told the jury that:

> Although Mr. Pokross [the Government's cooperating witness] keeps calling throughout the month of May and into early June trying to get Mr. Fidler to start moving as he keeps telling him, you got to do something, you got [to] do something, they never do and nothing happens and they don't go forward and do anything improper. They make no false filing with the SEC, they make no false registration statements, they never prepare a registration statement, *they do nothing.*

Trial Transcript ("Tr.") at 121 (emphasis added). Fidler's counsel told the jury:

> He [Fidler] handled an average caseload of about six or seven cases. He was one of those local guys where you would say to your neighbor, who did you use for a real estate closing and they said Roger Fidler and you would call him up at home and his wife might answer, his son might answer, Roger might answer. In the middle of dinner he would talk to you about the situation you had. He

might have gone to criminal court once or twice, handled some speeding tickets. *Id.* at 127. At this point, the Court questioned counsel and asked "Is this what you intend to prove?" *Id.* Counsel responded, "Yes, your Honor." *Id.* Counsel thereby committed himself, before the jury, to calling Fidler as a witness.

At the close of the fifth day of trial, March 2, 2001, the Government wrote to the Court and opposing counsel alerting everyone to its intention to call a previously unnamed and unidentified witness, Hait, in its direct case. The Government's letter provided a detailed proffer of Hait's testimony. Both defense counsel submitted written responses to the Government's letter on March 3 and March 5, respectively. Not surprisingly, they strenuously objected to his testimony. Their primary objection was to the late notice which they assert sandbagged them into making certain statements in their openings which they may not have made had they known of the Government's intention to call Hait as a witness. Other grounds for their objection included lack of relevance, the invasion of the attorney-client privilege and the highly prejudicial content of some of the proffered testimony, pursuant to Rule 403 of the Federal Rules of Evidence. These issues were argued at length during a telephone conference held on March 6, 2001.

## II. DISCUSSION

 It is well settled that a defendant has no general right to pretrial disclosure of the Government's witnesses. *See United States v. Bejasa,* 904 F.2d 137, 139 (2d Cir.1990); *United States v. Edwards,* 47 F.3d 841, 844 (7th Cir.1995). However, the " 'district courts have authority to compel pretrial disclosure of the *identity* of government witnesses.' " *Bejasa,* 904 F.2d at 139 (quoting *United States v. Can-*

*none,* 528 F.2d 296, 300 (2d Cir.1975)) (emphasis in original). Moreover, where such disclosure has been made, the decision whether to admit the testimony of a witness not included on the Government's witness list lies within the sound discretion of the Court. *See United States v. Cruz,* 156 F.3d 22, 29 (1st Cir.1998).

### A. Late Notice and Prejudice

■ Defendants argue that Hait's testimony should be precluded due to unfair surprise. In order to assess this argument, it is important to know when the Government could have, and should have, disclosed its intent to call Hait as a witness. Because Hait had signed opinion letters and because his name had been mentioned during tape-recorded conversations, the Government knew, or should have known, of his existence for several months prior to trial. Despite that, the prosecutor represented that he did not become aware of Hait's existence until he obtained the share transfer records and reviewed certain transcripts within the two to three weeks prior to trial. Once he learned of Hait, he attempted to interview him, but was rebuffed. On February 26, 2001, he sought an Order of Immunity which he received on February 27, 2001. *See* Tr. at 586–87. Only then did Hait speak to the prosecutor, an interview which occurred on February 28, 2001. Two days later, the prosecutor wrote his letter to the Court and counsel. In addition to providing this explanation, the prosecutor argued that the Court had not ordered the production of a witness list, and he did not understand the requirement to provide the names of witnesses for voir dire purposes to constitute such an order. *See* Tr. at 585.

The defense made a timely request for the identification of all witnesses or potential witnesses. *See* Pre–Trial Motions at Request 28(g) and (y). The Government opposed this request in its Memorandum of Law in Opposition to Gasparik's Pretrial Motions, dated December 8, 2000.[2] The defense request was denied at a conference held on January 25, 2001. Nonetheless, the Court required the parties to submit witness lists as part of their proposed voir dire. In its Proposed Examination of Prospective Jurors, submitted on February 21, 2001 (five days prior to trial), the Government identified thirteen potential witnesses in Request # 17. At the close of that request the Government noted in bold letters "**[names to be supplemented on morning of trial]**". On the morning of trial, the Government supplied the Court with the names of four additional witnesses and three companies. All the names were read to the jury. As noted earlier, Hait was not on either list.

Had defendants learned that Hait might be a witness, even on the morning of trial, they might have adjusted their trial strategy or, at the very least, presented different opening statements. In any event, such notification would have provided de-

---

**2.** The Government cited many cases denying a defense request requiring the Government to produce a witness list prior to trial. *See, e.g., United States v. Alessi,* 638 F.2d 466, 481 (2d Cir.1980) ("[T]he prosecution [is] under no obligation to give [the defendant] advance warning of the witnesses who would testify against him."); *United States v. Cannone,* 528 F.2d 296, 301–02 (2d Cir.1975) (district court abused discretion in granting defense motion for witness list supported only by general statement of need). In addition, it is clear that Rule 16 of the Federal Rules of Criminal Procedure does not require the pretrial identification of witnesses, although it did at one time. *See Bejasa,* 904 F.2d at 139; *see also* Conference Committee Notes, H. Rep. 94–414, Rule 16, ¶ (C) (expressly rejecting version of bill which provided that each party may discover the names and addresses of the other party's witnesses three days before trial).

fense counsel with a reasonable opportunity to address the complicated privilege issues that arise from this proffer. Learning of this witness mid-trial has created both unfair surprise and prejudice.

The Government easily could have learned of Hait's existence months before trial by reviewing the tapes or by obtaining the share transfer records. Had it done so, it could have made an earlier determination to grant immunity. In that event, the thorny privilege issues could have been raised prior to trial, when both the Court and counsel would have had a better opportunity to address those issues, including the possibility of an *in camera* proffer.

■ But the real point is prejudice to the defense. While no party has cited controlling authority in this Circuit, there are interesting precedents discussing the lack of prejudice as a ground for permitting a witness to testify despite the failure to disclose the identity of that witness. By implication, the converse is also true. When the prejudice is severe, preclusion may be warranted.

In *United States v. Perkins,* 994 F.2d 1184 (6th Cir.1993), the Sixth Circuit affirmed a conviction where the trial court had denied a defense request for pretrial identification of informants and co-conspirators. The court noted that a defendant is not entitled to a list of the Government's witnesses. *See id.* at 1190. However, the court also noted that the Government identified the witness by name in its opening statement and that the defendant did not object to the testimony nor seek a continuance.

[D]uring oral argument, counsel for Perkins [the defendant] admitted that he

did not object to Berry's testimony and did not request a recess or continuance when she was called as a witness. Thus, Perkins has not shown that he was prejudiced in any way by Berry's testimony.

*Id.* at 1191. Similarly, in *United States v. Sims,* 156 F.3d 1233 [Table]; 1998 WL 415977, at *1 (6th Cir.1998),[3] defendant argued, in appealing his conviction, that his trial preparation was compromised by the Government's failure to disclose the name of a co-conspirator. In that case, the Government had provided a list of co-conspirators in response to the defense request for a bill of particulars. The list was provided on the day the trial began. Twenty-one names were provided, but not the name of Cain, one of the co-conspirators. In its argument in defense of the conviction, the Government noted that it had

explicitly detailed Cain's involvement with defendant in [its] opening statement, given just a few hours after the incomplete list of names was tendered to the defense . . . .

*Id.* at *2. The court held that because of this defendant was not deprived of pretrial preparation. The court specifically noted that the record does not reflect any claim by defendant of surprise or a request for additional time to prepare for Cain's testimony. *See id.; see also Cruz,* 156 F.3d at 29 (affirming trial court's decision to permit witness not included on Government's witness list to testify because "nothing in the record suggests that [defendant] was prejudiced" by the Government's omission); *Edwards,* 47 F.3d at 845 (holding that refusal to exclude testimony of witness not included on witness list not re-

---

**3.** While *Sims* is an unpublished opinion, the rules of the Sixth Circuit specifically allow such opinions to be cited. *See* U.S.Ct. of App. 6th Cir. Rule 28(g); *see also Managed Health*

*Care Assocs. v. Kethan,* 209 F.3d 923, 929 (6th Cir.2000) ("Sixth Circuit Rule 28(g) . . . does not preclude this court from considering the persuasive reasoning of unpublished cases.").

versible error because defendants did "not establish[ ] that they were in any way prejudiced by the admission of [the witness'] testimony").

Finally, in *United States v. Taylor*, 71 F.Supp.2d 420, 425 (D.N.J.1999), the Government had agreed with defense counsel not to offer an admission of the defendant in its case in chief. Because of an unexpected failure by its principal trial witness to identify the defendant, the Government reneged on its promise and moved in midtrial to offer the defendant's admission. The trial court denied the Government's request.

> The most important factor this Court must consider is whether the Defendant has been prejudiced by his reliance on the Government's promise. I find that the prejudice in this instance is the same as it is regarding the expert testimony [which the Government also sought to offer for the first time and which the trial court prohibited]. The statement itself had to be considered by the Defendant and his counsel in deciding whether or not he would testify. This determination inevitably affects counsel's opening statement, the cross-examination of witnesses, and the Defendant's trial strategy.

*Id.* at 425.

I conclude that when the Government supplied its list of witnesses as supplemented on the morning of trial, it identified its witnesses to the defendants, and the defendants reasonably relied on that list in their opening statements. Moreover, permitting Hait to testify in the Government's direct case would substantially and unfairly prejudice defendants because of the statements and representations defendants made in their opening statements. Accordingly, the Government is precluded from calling Hait in its direct case.

**B. Proffer, Privilege and Rebuttal**

■ On the other hand, rebuttal witnesses cannot always be anticipated as much depends on what is introduced in the defense case. Thus, the Government's failure to identify Hait in its witness list does not warrant his preclusion in rebuttal. Depending on the testimony offered in the defense case, Hait may be permitted to testify as a rebuttal witness. As a result of this ruling, it is now necessary to address the proffer in some detail and the privilege issues that it raises.

In its March 2 letter, the Government provided a detailed proffer in numbered paragraphs. During the oral argument, the parties addressed the issues by reference to those paragraphs. For the sake of simplicity, I will rule in the same manner.

**1. Paragraphs 1, 2 and 6—Background Information**

■ Paragraphs 1 and 2 are merely witness background and as such raise no issues of privilege or relevance. The witness will be permitted to testify in accordance with the proffer. Thus Hait can inform the jury of his education and his job as Fidler's associate. Paragraph 6, too, consists primarily of background material. Hait, therefore, will be allowed to testify that he ended his association with Fidler in January 2000 and established his own practice. Hait can further testify that Fidler referred clients to him and informed him that Fidler was giving up the practice of law.[4]

---

4. However, one portion of paragraph 6 will not be allowed. The Government asks that Hait be permitted to testify that he "followed

a practice of requiring these prospective clients to submit to extensive due diligence and compliance changes before accepting

## 2. Paragraphs 3, 4 and 5—Public Documents

 Paragraph 3 addresses Hait's preparation of a trust indenture for the Blanchard and De Boer Charitable Remainder Trust ("Blanchard Trust"), a trust established by Gasparik purportedly for the benefit of his grandchildren. The indenture itself is not privileged because it has been publicly disclosed. Hait would testify that Fidler told him that the indenture was prepared at the request of Gasparik.[5]

 The Government argues that a key issue in the case is Gasparik's continued control of the Blanchard Trust at the time of the stock offering because by transferring stock to the Blanchard Trust and then having the Blanchard Trust transfer stock to the co-conspirators, defendants were able to evade the Securities and Exchange Commission's registration requirements. *See* Tr. at 92 (Government's opening statement describing important role of the Blanchard Trust in the alleged securities fraud conspiracy). Because control of the Blanchard Trust is a key issue in this case, the Government argues that the preparation of the indenture at Gasparik's request is relevant. While the indenture was prepared in

1997—when the Blanchard Trust was established, but several years prior to formation of the alleged conspiracy—and while it is typical for a grantor to arrange for the preparation of the indenture, the testimony is nonetheless relevant to establish the background of the creation of the Blanchard Trust. Because the testimony is not privileged and is relevant, it will be allowed if Hait is called as a rebuttal witness.

 The same reasoning applies to the proffer contained in paragraph 4, which states that Hait drafted and signed two opinion letters dated August 28, 1998 and May 17, 1999, respectively. These letters, both addressed to a Jeffrey Manger of the Jersey Transfer & Trust Co., provide Hait's legal opinion as to the "legality of the gift" to the Blanchard Trust. Government Exhibit 200 at 12 and 30. The letter goes on to state that "pursuant to Rule 144(k), [the Blanchard Trust] is entitled to have unlegended Certificates issued...." *Id.* Once again, Hait will testify that Fidler told him that the letters were to be prepared at Gasparik's request. Finally, Hait will testify that Fidler reviewed the letters before they were released.[6]

them" and that he rejected "at least three former clients who refused to agree to the due diligence and compliance changes." 3/2/01 Letter from Assistant United States Attorney Patrick J. Smith at 3. This testimony would prove that Fidler has engaged in similar misconduct in the past. It is, therefore, a backdoor effort to circumvent the Court's ruling on March 1, 2001 barring the Government from presenting any Rule 404(b) material. *See* Tr. at 398–99. On November 3, 2000, in his Notice of Pre–Trial Motions, Gasparik specifically requested notice of any 404(b) evidence, but the Government failed to provide timely notice of its intent to offer such testimony. *See* Fed.R.Evid. 404(b) ("[U]pon request by the accused, the prosecution in a criminal case shall provide reasonable notice

in advance of trial ... of the general nature of any such evidence [of other crimes, wrongs, or acts] it intends to introduce at trial."). To allow such testimony now would be fundamentally unfair.

5. Fidler's statement to Hait is not hearsay because it is a statement of a party-opponent. *See* Fed.R.Evid. 801(d)(2) (a statement is not hearsay if it "is offered against a party and is [ ] the party's own statement"). The statement is clearly offered against Fidler to show his intimate knowledge of the Blanchard Trust.

6. During oral argument, I ruled that, pursuant to Fed.R.Evid. 403, Hait may not testify that he was not admitted to the bar when he

The opinion letters themselves are not privileged as they have been made public. For the reasons stated earlier, Fidler's statement to Hait is admissible. Finally, the testimony is relevant to the issue of whether Gasparik exercised control over the Blanchard Trust. As a result, with one exception, *see supra* note 6, Hait will be permitted to testify as to paragraph 4 of the proffer letter.

 Paragraph 5 describes other legal work that Hait performed for Gasparik, including drafting several option agreements to buy Harbour Intermodal stock from the Blanchard Trust, preparing and filing Harbour Intermodal's form NT 10Q with the SEC, and preparing a complaint in a lawsuit in which the Blanchard Trust sought to recover a fee from a Joshua Ader. The option agreements were prepared in late 1998 and throughout 1999, the Form 10Q was prepared in March, 2000 and the complaint was prepared sometime in 1999. *See* Tr. at 608. During oral argument, the prosecutor supplemented his letter and disclosed that Hait met with Gasparik in order to draft these documents and that the share transfer records reveal receipts establishing that Gasparik picked up the shares on behalf of the Blanchard Trust. *See id.* at 607–08.

 There can be no question that none of these documents are privileged since all have been publicly released. There can also be no question that this testimony is highly relevant because it goes directly to the issue of who controlled the Blanchard Trust and when. As such, the testimony will be permitted. However, a question remains as to what statements Gasparik may have made to Hait in the course of the representation and whether such statements are protected by the attorney-client privilege. In order to make this determination, the Court is required to conduct an *in camera* examination of Hait. Gasparik and his counsel are permitted to be present at this examination because the examination will relate solely to communications between an attorney and his client. The prosecutor and Fidler's counsel may submit written questions to be posed during this examination. Until this examination is complete, I cannot make a final determination as to whether Hait will be permitted to testify as to his conversations with Gasparik concerning the documents described in paragraph 5.

### 3. Paragraph 7—Attorney–Client Communications

 Paragraph 7 involves Gasparik's request in May 2000 that Hait prepare an SB–2 registration statement for a Harbour Intermodal securities offering. In their meeting to discuss the representation, Hait quoted a high fee and informed Gasparik that substantial due diligence would be required. The remaining content of the conversation is unknown because the Government's debriefing of Hait was suspended pending resolution of any attorney-client privilege issue. Ultimately, however, Gasparik did not retain Hait to prepare the statement. Paragraph 7 also describes a conversation between Fidler and Hait in which Fidler told Hait not to "turn away" Gasparik as he had done with other referrals. Hait's conversation with Fidler is obviously a non-privileged conversation, and because it is highly probative Hait's testimony concerning that conversation will be permitted.[7] However, the conver-

---

signed the opinion letters and that because he did not understand the operation of SEC Rule 144, he relied on Fidler for guidance. *See* Tr. at 694.

7. Although Fidler's statement to Hait will be permitted, it may only be offered in the somewhat sanitized version described above. By contrast, the Government's proffer—that "Fi-

sation with Gasparik squarely raises the issue of attorney-client privilege.[8]

■ "The administration of the [attorney-client] privilege in the courts requires recognition that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir.2000) (quotation marks omitted). While the Government concedes that Gasparik and Hait had an attorney-client relationship, it argues that the privilege is inapplicable here for two reasons: (1) Gasparik impliedly waived the privilege by raising an advice of counsel defense; and (2) the communication falls under the "crime-fraud" exception.

### a. Waiver

■ The Second Circuit has recognized that implied waiver may be found where the client "asserts a claim that *in fairness* requires examination of protected communications." *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir.1991) (emphasis added). Such fairness issues arise where the client attempts to use the privilege both as a shield and a sword. *See In re von Bulow*, 828 F.2d 94, 103 (2d Cir.1987).

For example, a defendant who intended to testify as to his "good faith" reliance on legal advice could not prevent the Government from cross-examining him on the advice he received from counsel. *See Bilzerian*, 926 F.2d at 1292.[9]

■ The Government's advice of counsel argument is unavailing. Assuming, arguendo, that Gasparik impliedly waived his privilege with respect to Fidler, such a waiver would not extend to advice sought or received from other lawyers. More important, Gasparik has not impliedly waived his attorney-client privilege with respect to Fidler. Gasparik's attorney raised his good faith defense in his opening statement, but only in a very limited fashion. He told the jury that Gasparik did not want to do anything illegal and preferred to be guided by his attorney, Fidler. *See* Tr. at 114 ("I wanted to be guided, Mr. Gasparik says, by whatever my attorney says is appropriate.... Now the government hears again ... [that] Mr. Gasparik doesn't want to do anything [and that] [h]e wants to be guided by his attorney. He wants to do things legally."). Gasparik's attorney has not referenced a particular conversation between Gasparik and Fidler, nor has any confidential and

---

dler told Hait, in substance, not to turn away this client as he had three others by insisting on due diligence and quoting high fees—would run afoul of the Court's ruling excluding Rule 404(b) material." *See supra* note 4.

8. However, any discussion between an attorney and his client relating to fee arrangements or the general nature of the services to be provided does not fall within the rubric of the attorney-client privilege, absent special circumstances such that disclosure would amount to divulging confidential communications. *See, e.g., Vingelli v. United States*, 992 F.2d 449, 452 (2d Cir.1993); *Colton v. United States*, 306 F.2d 633, 636 (2d Cir.1962).

9. By contrast, the D.C. Circuit declined to find a waiver when the defendant testified at

trial that he lacked the intent to commit the crime because, after meeting with his attorneys, he believed that his actions were lawful. *See United States v. White*, 887 F.2d 267, 271 (D.C.Cir.1989) (Ginsburg, J.). The *White* court stated:

An averment that lawyers have looked into a matter does not imply an intent to reveal the substance of the lawyers' advice. Where a defendant neither reveals substantive information, nor prejudices the government's case, nor misleads a court by relying on an incomplete disclosure, fairness and consistency do not require the inference of waiver.

*Id.* at 271 (citing *In re von Bulow*, 828 F.2d at 101–02).

privileged information been disclosed. Rather, Gasparik has averred generally that he would not act without his attorney's authorization. This does not constitute a broad subject-matter waiver of the attorney-client privilege. *See White*, 887 F.2d at 271 ("A general assertion lacking substantive content that one's attorney has examined a certain matter is not sufficient to waive the attorney-client privilege."); *cf. Bilzerian*, 926 F.2d at 1293 ("Courts cannot sanction the use of the privilege to prevent effective cross-examination on matters reasonably related to those introduced in direct examination."). Gasparik remains "free to . . . argue his good faith defense by means of defense counsel's opening and closing statements and by his examination of witnesses" without waiving his attorney-client privilege. *Bilzerian*, 926 F.2d at 1293.

### b. Crime–Fraud Exception

 It is well established that communications that otherwise would be protected by the attorney-client privilege are not protected if the communications are "in furtherance of contemplated or ongoing criminal or fraudulent conduct." *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997). "[A]dvice in furtherance of such goals is socially perverse, and the client's communications seeking such advice are not worthy of protection." *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1038 (2d Cir.1984). "A party wishing to invoke the crime-fraud exception must demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime." *Jacobs*, 117 F.3d at 87. The exception, however, does not apply where the communication merely provides the Government with evidence of a crime or fraud. *See In re*

*Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir.1995). Rather, the court must determine that the communication in question was *itself* in furtherance of the crime or fraud and was intended to facilitate the criminal or fraudulent activity. *See id.*

The legal work described in paragraph 7 of the proffer falls within the "crime-fraud" exception because it goes to the heart of the alleged fraud. The preparation of a registration statement was a necessary step in permitting the fraudulent stock purchase scheme to advance. Probable cause to believe that the fraud occurred has already been found by reason of the indictment. Furthermore, the evidence introduced during the first week of trial, consisting largely of tape recorded conversations between Gasparik and the cooperating witness, also lend substantial weight to the allegations of securities fraud—certainly enough weight to permit me to find probable cause to believe that Gasparik engaged in a stock fraud scheme. Thus, it is likely that Hait will be permitted to testify as to Gasparik's statements. *See In re Grand Jury Subpoena*, 731 F.2d at 1041 (applying crime-fraud exception where corporation sought legal advice in order to sell all the stock of its wholly-owned subsidiary and such a sale would be fraudulent because it was intended to delay or hinder the Government's ability to collect contempt fines). However, prior to making a final determination, this meeting will also be the subject of an *in camera* hearing.

### 4. Paragraphs 8 and 9—Fidler's Threats and Consciousness of Guilt

 Paragraphs 8 and 9 relate solely to Fidler. Paragraph 8 describes a June 2000 meeting between Hait and Fidler, following Fidler's arrest on the instant charge. Hait accuses Fidler of asking him

to backdate certain documents in an unrelated transaction and threatening Hait by telling him that if he refused to do what Fidler asked Fidler could inform the authorities that Hait was also involved in criminal activity involving a "pump and dump" scheme similar to that charged in this indictment. In paragraph 9, the Government proffers that within days of this meeting, Fidler entered Hait's office, without his consent, and removed all files relating to Fidler's former clients. The Government argues that Fidler's acts reflect his consciousness of guilt and are highly probative. Fidler's attorney, in turn, argues that this testimony's prejudicial nature substantially outweighs its probative value.

Hait will not be permitted to testify as to the matters covered by paragraph 8. The proffer reveals that the request to backdate documents related to an entirely separate scheme as did the threat to disclose Hait's involvement in yet another "pump and dump" scheme. Once again, my 404(b) ruling covers this proffer.

However, Hait will be permitted to testify regarding the paragraph 9 proffer. Fidler's alleged conduct in removing files from Hait's office, including files relating to Gasparik and the Blanchard Trust, is highly probative in demonstrating consciousness of guilt, and is not substantially outweighed by the danger of unfair prejudice. *See United States v. Padilla*, 203 F.3d 156, 162 (2d Cir.2000) (witness and jury tampering scheme uncovered mid-trial held admissible because it was highly probative of consciousness of guilt); *United States v. Malpiedi*, 62 F.3d 465, 467 (2d Cir.1995) (proof of altered documents shows consciousness of guilt).

### III. CONCLUSION

For the reasons stated above, the Government may not call Jay Hait as a witness in its direct case. However, Hait may be called as a rebuttal witness, in accordance with the rulings in this Opinion. If necessary, an *in camera* hearing will be held immediately following the close of the defense case.

So Ordered.